IN THE UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT

_____

SAZERAC COMPANY, INC.

Defendant/Petitioner

v.

WILBERT ANDREWS AND STEPHEN KAHN,

Plaintiffs/Respondents

_____

Appeal from the United States District Court
for the Southern District of New York

_____

**PETITION FOR PERMISSION TO APPEAL
UNDER FEDERAL RULE OF CIVIL PROCEDURE 23(f)**

Creighton R. Magid
Christopher G. Karagheuzoff
DORSEY & WHITNEY LLP
51 West 52nd Street
New York, NY  10019-6119
magid.chip@dorsey.com
karagheuzoff.christopher@dorsey.com
Telephone:  (212) 415-9200
Facsimile (212) 953-7201

Attorneys for Defendant/Petitioner Sazerac Company, Inc.

Table of Contents

Page

Table of Authorities.............................................................................ii

BACKGROUND ................................................................................. 2

QUESTIONS PRESENTED ................................................................ 7

RELIEF SOUGHT............................................................................... 8

REASONS WHY AN APPEAL SHOULD BE GRANTED ...................... 8

I.    PERMISSION TO APPEAL SHOULD BE GRANTED
      UNDER THE "DEATH KNELL" STANDARD. ............................. 9

      A.    Certification Effectively Terminates the Litigation.............. 9

      B.    The District Court's Certification Order is Highly
            Questionable.......................................................................... 10

            1.    *Plaintiffs' Damages Model is Incapable of
                  Measuring Class-Wide Damages.* ............................... 10

            2.    *Plaintiffs' Damages Model Cannot Establish
                  Class-Wide Damages Because It Confuses
                  "Willingness to Pay" with "Market Price."* ................... 15

II.   PERMISSION TO APPEAL SHOULD BE GRANTED TO
      ADDRESS LEGAL QUESTIONS ABOUT WHICH THERE
      IS A COMPELLING NEED FOR IMMEDIATE
      RESOLUTION.............................................................................. 20

CONCLUSION .................................................................................. 22

Certificate of Compliance With Type-Volume Limit, ........................... 25

Typeface Requirements, and Type-Style Requirements ....................... 25

Table of Authorities

Page

## Cases

*Comcast Corp. v. Behrend*, 569 U.S. 27
(2013) ....................................................1, 3, 6, 7, 10, 11, 13, 14, 16, 21

*Famular v. Whirlpool Corp.*, 2019 WL 1254882
(S.D.N.Y. Mar. 19, 2019) ........................................................6

*Hevesi v. Citigroup Inc.*, 366 F.3d 70 (2d Cir. 2004)................................9

*In re Gen. Motors Ignition Switch Litig.*, 407 F. Supp. 3d
212 (S.D.N.Y. 2019) .................................................. 16, 17, 19

*In re Kind LLC "Healthy & All Nat." Litig.*, 337 F.R.D. 581
(S.D.N.Y. 2021)........................................................21

*In re NJOY Consumer Class Action Litig.*, 120 F. Supp. 3d
1050 (C.D. Cal. 2015) ................................................ 15, 16

*In re Scotts EZ Seed Litig.*, 304 F.R.D. 397 (S.D.N.Y. 2015).................14

*In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods.
Liab. Litig.*, 500 F. Supp. 3d 940 (N.D. Cal. 2020), *aff'd sub
nom. Schell v. Volkswagen AG*, 2022 WL 187841 (9th Cir. Jan.
20, 2022) ........................................................15

*Mier v. CVS Health*, 2023 WL 4837851 (9th Cir. July 28, 2023) ...........14

*Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259
F.3d 154 (3d Cir. 2001)........................................................9

*Parker v. Time Warner Entm't Co., L.P.*, 331 F.3d 13 (2d Cir.
2003) ........................................................9, 22

*Passman v. Peloton Interactive, Inc.*, 671 F. Supp. 3d 417
(S.D.N.Y. 2023)........................................................16

*Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.*, 262
    F.3d 134 (2d Cir. 2001).......................................................... 8, 20

*West v. Prudential Securities, Inc.*, 282 F.3d 935 (7th Cir. 2002) ........... 9

**Statutes**

New York General Business Law § 349.................................................... 2

New York General Business Law § 350........................................... 1, 2, 9

**Rules**

Fed. R. App. P. 5........................................................................................ 8

Fed. R. Civ. P. 23(b)(3) ................................................................. 3, 10, 11

Fed. R. Civ. P. 23(f) ............................................................................... 8, 9

This Petition involves two issues that arise in nearly all consumer product labeling class actions in which plaintiffs claim to obviate the need for individual damages determinations by alleging the existence of a class-wide "price premium" derived from a "conjoint survey." First, does a damages measure derived from a "conjoint survey" comport with the requirements of *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013), when it fails to isolate the damages allegedly attributable to the product label from significant factors such as consumers' desire for convenience? Second, does a damages model comport with the requirements of *Comcast* when it measures (if anything) only consumer demand but not supply-side factors, such as sellers' ability or willingness to sell at a particular price? Because both of these questions arise frequently in consumer class actions, they should be resolved by this Court on an interlocutory basis. This is particularly so because certification of a class in consumer labeling cases essentially terminates the litigation – particularly in cases, such as this one, brought under New York General Business Law § 350, in which plaintiffs seek damages of $500 *per sale* of high-volume, low-priced consumer products.

## BACKGROUND

Sazerac Company, Inc. ("Sazerac") sells a variety of alcoholic beverages in single-serving (50 ml) bottles, including Southern Comfort, a beverage with spice-and-fruit flavor profile.  Sazerac offers spirit-based versions of Southern Comfort, which are sold at retail locations licensed to sell distilled spirits, and malt- and wine-based versions (depending upon the state), which are sold at retail locations licensed to sell malt beverages, including beer, but not distilled spirits.

Plaintiff Christina Del Rosario brought this putative class action pursuant to New York General Business Law §§ 349 and 350 alleging that the labels of 50 ml and 100 ml bottles of Southern Comfort malt beverage led consumers to believe that they were purchasing a whiskey-based product by, among other things, utilizing the "Southern Comfort" brand name and including a federally-required statement of composition that identifies the product as a "malt beverage with natural whiskey flavors."  Wilbert Andrews and Steven Kahn, who replaced Ms. Del Rosario as the named plaintiffs, moved for certification of a class of all New York consumers who had purchased the malt-based version of Southern Comfort since February 8, 2020.  In an effort to satisfy the

2

predominance requirement of Fed. R. Civ. P. 23(b)(3), Plaintiffs asserted that they could establish a "price premium" paid by all purchasers of Southern Comfort malt beverage, based on a "conjoint survey" conducted by their retained expert, Dr. William Ingersoll. Based on his survey, Dr. Ingersoll concluded that consumers would pay 11.8 percent more for a 50 ml bottle of spirit-based Southern Comfort than for a 50 ml bottle of malt-based Southern Comfort. Dr. Ingersoll then concluded, based on historical retail prices, that if Sazerac were to change the label on malt-based Southern Comfort to make abundantly clear that the product was a malt-based beverage and not a spirit-based beverage, it would have to decrease the product's retail price 8.8 percent in order to maintain its current sales volume.

In its Opposition to Plaintiffs' class certification motion, Sazerac argued that Dr. Ingersoll's survey failed to satisfy *Comcast*'s requirement that "a model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to [the class liability] theory." *Comcast*, 569 U.S. at 35. Sazerac provided unrebutted evidence that convenience was one of – if not *the* – primary purchase drivers for single-serving bottles of alcoholic beverages, yet

3

Dr. Ingersoll failed to separate the effect of convenience from the alleged effect of the label on consumers' claimed willingness to pay for malt-based Southern Comfort.

Sazerac's very purpose for introducing a malt beverage version of Southern Comfort was to make the beverage more convenient for consumers by making it available at convenience stores and other outlets licensed to sell malt beverages but not distilled spirits.[1]  Dr. Ingersoll explicitly instructed his survey respondents that Southern Comfort malt beverage and spirit-based Southern Comfort were available on the same shelf at the same store – a situation that does not exist in the real world.  Dr. Ingersoll therefore failed to test whether there was any "price premium" attributable to the product label at all: at most, his survey found that, in the abstract, consumers prefer "whiskey" to a generic "malt" beverage, but failed to determine whether, in the real world, this preference is secondary to the value consumers place on being able to purchase Southern Comfort malt beverage where

---

[1]  In New York State, distilled spirits and malt beverages cannot be sold at the same retail location.  Only retailers licensed to sell spirits may sell the spirit version of Southern Comfort, while only retailers licensed to sell malt beverages may sell the malt version of Southern Comfort.

they regularly shop as opposed to traveling to a liquor store to purchase spirit-based Southern Comfort.[2]

Sazerac also argued that Dr. Ingersoll's survey did not yield a measure of class-wide damages because it considered only consumer's willingness to pay, and not the supply side of the equation. Dr. Ingersoll simply *assumed* a constant volume of sales and *assumed* that Sazerac would reduce the price of malt-based Southern Comfort with an explicit "this is a malt, not a whiskey" label in order to maintain the same level of sales in the face of lower aggregate willingness to pay. The evidence before the District Court, however, was that Sazerac *would not* and *could not* decrease the price of malt-based Southern Comfort, for several reasons, including the greater cost of producing the malt version of Southern Comfort than the spirit-based version and the fact that Sazerac's spirits distributors would not allow Sazerac to

---

[2] Sazerac's expert, Dr. David Reibstein, pointed out numerous other critical flaws in Dr. Ingersoll's survey, including the survey's definition of "malt" – even Dr. Ingersoll acknowledged that his survey respondents may have been choosing between "whiskey" and beverages that taste like beer, rather than between spirit-based and malt-based beverages that taste the same – and the use of a survey population that was not limited to purchasers or prospective purchasers of malt-based Southern Comfort. Dkt. 77-5 at 39 – 55.

undercut the pricing of spirit-based Southern Comfort with the malt-based product. Therefore, even if Dr. Ingersoll could show a preference, in the abstract, for "whiskey" over a generic "malt" beverage, he did nothing to establish a market price, which is determined by the intersection of supply and demand. Sazerac may have faced reduced demand in Dr. Ingersoll's hypothetical "but for" world, but the price of malt-based Southern Comfort would remain the same. Plaintiffs therefore have no measure of class-wide damages.

Despite the absence of a valid mechanism for establishing class-wide damages, the District Court certified the class. Although acknowledging that "[c]ourts routinely reject price premium methodologies under *Comcast* when the proposed methodologies do not attempt to isolate the premium due only to the allegedly misleading marketing statement," Dkt. 91 at 11 (quoting *Famular v. Whirlpool Corp.*, 2019 WL 1254882, at *11 (S.D.N.Y. Mar. 19, 2019)), the District Court concluded that *Comcast* applied only to isolation of "product features" and did not require "control for *external* factors like flavor and convenience to measure the existence of a price premium." Dkt. 91 at 11 (emphasis in original). The District Court did not explain why

conflating "product features" with the effects of any allegedly misleading label would fail to "measure only those damages attributable to [the class liability] theory," *Comcast*, 569 U.S. at 35, but that conflating "external factors" with the effects of any allegedly misleading label would result in an acceptable damages measurement.

The District Court also concluded that Dr. Ingersoll had, in fact, accounted for "supply-side factors" by "using pricing data generated from 'actual market transactions in New York.'" Dkt. 91 at 12. Dr. Ingersoll, however, only used historical pricing data in formulating the questions posed to his survey respondents. This may have made the questions more realistic than they otherwise would have been, but served only to measure *consumer preferences* – not anything related to "supply-side factors."

## QUESTIONS PRESENTED

1.    Whether the District Court erred as a matter of law in concluding that *Comcast*'s holding that "a model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to [the class liability] theory" applies only when damages attributable to the liability theory are conflated with "product

features" but not when such damages are conflated with "external factors."

2.      Whether the District Court erred as a matter of law in holding that use of historical pricing data to determine consumer preferences obviated the need to consider supply-side factors when modeling a price premium.

## RELIEF SOUGHT

Pursuant to Fed. R. Civ. P. 23(f) and Fed. R. App. P. 5, Sazerac requests permission to appeal from the District Court's order of January 2, 2024, granting Plaintiffs' motion for class certification.

## REASONS WHY AN APPEAL SHOULD BE GRANTED

In *Sumitomo Copper Litig. v. Credit Lyonnais Rouse, Ltd.*, 262 F.3d 134 (2d Cir. 2001), this Court held that

> petitioners seeking leave to appeal pursuant to Rule 23(f) must demonstrate either (1) that the certification order will effectively terminate the litigation and there has been a substantial showing that the district court's decision is questionable, or (2) that the certification order implicates a legal question about which there is a compelling need for immediate resolution.

*Id.* at 139.  Both standards militate in favor of granting this Petition and reversing the District Court's certification of the putative class.

## I. PERMISSION TO APPEAL SHOULD BE GRANTED UNDER THE "DEATH KNELL" STANDARD.

### A. Certification Effectively Terminates the Litigation.

As this Court has recognized, "[t]he effect of a class certification in inducing settlement to curtail the risk of large awards provides a powerful reason to take an interlocutory appeal." *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 80 (2d Cir. 2004) (quoting *West v. Prudential Securities, Inc.*, 282 F.3d 935, 937 (7th Cir. 2002)). The "inordinate or hydraulic pressure on defendants to settle, avoiding the risk, however small, of potentially ruinous liability," *Newton v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 259 F.3d 154, 164 (3d Cir. 2001) (quoting Rule 23(f) Comm. Note), is particularly acute here, because plaintiffs seek statutory damages of $500 *per sale* of millions of bottles of malt-based Southern Comfort under New York General Business Law § 350 – a multiple of 5700 times Plaintiffs' claimed actual damages. The threat of such a "devastatingly large damages award, out of all reasonable proportion to the actual harm suffered by members of the plaintiff class," *Parker v. Time Warner Entm't Co., L.P.*, 331 F.3d 13, 22 (2d Cir. 2003), essentially makes continued litigation untenable. *See id*. ("combining a statutory scheme that imposes minimum statutory

damages awards on a per-consumer basis" with the class action mechanism results in "a distortion [that] could create a potentially enormous aggregate recovery for plaintiffs, and thus an *in terrorem* effect on defendants, which may induce unfair settlements.").

### B. The District Court's Certification Order is Highly Questionable.

Fed. R. Civ. P. 23(b)(3) "requires a court to find that 'the questions of law or fact common to the class members predominate over any questions affecting only individual members.'" *Comcast*, 569 U.S. at 33 (quoting Rule 23(b)(3)). Absent a model "establishing that damages are capable of measurement on a classwide basis" a plaintiff "cannot show Rule 23(b)(3) predominance: questions of individual damage calculations will inevitably overwhelm questions common to the class." *Id.* The District Court erred as a matter of law in certifying a class even though Plaintiffs failed to proffer a damages model capable of measuring damages on a class-wide basis.

### 1. *Plaintiffs' Damages Model is Incapable of Measuring Class-Wide Damages.*

The Supreme Court in *Comcast* made clear that

a model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to [the class liability] theory. If the model does not even

> attempt to do that, it cannot possibly establish that damages
> are susceptible of measurement across the entire class for
> purposes of Rule 23(b)(3).

*Comcast*, 569 U.S. at 35. Plaintiffs' damages model does not even

attempt to measure only damages attributable to the challenged label.

As explained above, a primary factor – if not *the* primary factor –

in consumers' purchases of single- and double-serving bottles of

alcoholic beverages is convenience. The undisputed evidence below

establishing the singular importance of *convenience* in consumers'

purchases of alcoholic beverages included both independent research

published by Nielsen Consumer, LLC, and empirical data. Consumers

value malt-based Southern Comfort because it can be purchased at a

convenience store or small grocery while picking up a bag of chips or

filling a car with gas; there is no need to make a separate trip to a

liquor store to purchase spirit-based Southern Comfort. Indeed,

consumers can buy malt-based Southern Comfort at many locations 24

hours a day, every day, whereas New York law limits sales of spirits to

certain hours. Yet Dr. Ingersoll, in his first-ever conjoint survey, simply

elided this primary factor in consumers' purchasing decisions by telling

his survey respondents that they should imagine themselves "at the

store shopping for alcoholic beverages," that they see both "malt" and "whiskey (distilled spirit)" Southern Comfort "on the shelf" and "that you do not have time to go to another store." Dkt. 77-5 at 41. By positing this situation, which cannot occur in the real world, where New York law requires liquor and malt beverages to be sold at different stores and bars sales of liquor during certain hours, Dr. Ingersoll wholly failed to consider the premium consumers place on the *convenience* of being able to purchase malt-based Southern Comfort at many more locations and at more times of the day. In doing so, he arbitrarily concealed the likelihood that no price premium exists because the value consumers place on convenience is greater than the value (if any) consumers place on the base alcohol in their Southern Comfort. Dr. Ingersoll's model therefore is incapable of identifying whether a price premium attributable to Plaintiffs' liability theory exists at all because it fails to answer a critical question: are consumers paying a "price premium" because of the allegedly deceptive label, or are they more than willing to pay the current retail price because the value of convenience greatly outweighs any purported preference for "whiskey" over "malt" as a base alcohol in Southern Comfort?

12

The District Court recognized that a price premium model does not satisfy *Comcast* if it fails to control the effect on price of factors other than the theory of liability. Dkt. 91 at 11. However, the court concluded that *Comcast* required the isolation of the price effect of the theory of liability from other "product features," but did not require isolation of the price effect of the theory of liability from "*external* factors like flavor and convenience." *Id.* (emphasis in original).

There is no legal or logical basis for such a distinction. *Comcast* made clear that "a model purporting to serve as evidence of damages in [a] class action must measure only those damages attributable to [the class liability] theory." *Comcast*, 569 U.S. at 35. The Supreme Court termed this an "unremarkable premise," since plaintiffs are only entitled to damages resulting from the claimed wrong. *Id.* If the damages model measures something else, it is invalid. It matters not whether the "something else" is a conflation of the value consumers place on various product features or the artificial disregard of the value consumers place on convenience. If the model doesn't measure damages (or the absence of damages) attributable to the liability theory under real-world conditions, class certification must be denied. *See In re*

*Scotts EZ Seed Litig.*, 304 F.R.D. 397, 413 (S.D.N.Y. 2015) (collecting cases) ("Courts routinely reject price premium methodologies under *Comcast* when the proposed methodologies do not attempt to isolate the premium due only to the allegedly misleading marketing statement. These courts correctly point out consumers may pay a higher price for a product for many reasons that have nothing to do with specific advertising claims, including brand loyalty and product quality.") (internal citations omitted); *Mier v. CVS Health*, 2023 WL 4837851, at *1 (9th Cir. July 28, 2023) ("If the value of the product on the open market were the same regardless of the alleged misrepresentation, then there would be no difference between what the consumer paid for the product and what the market price of the product would have been but for the statement.").

The District Court's exclusion of "external factors" from *Comcast* analysis is wholly unsupported.[3] The court's certification of the class is therefore questionable.

---

[3] It is also unclear why the District Court did not deem convenience to be a "product feature." Convenience, after all, is very much a "product feature" – along with flavor, probably *the* most important feature of a product that typically retails for less than a dollar for a 50 ml bottle.

2. ***Plaintiffs' Damages Model Cannot Establish Class-Wide Damages Because It Confuses "Willingness to Pay" with "Market Price."***

A basic tenet of economics is that a market price is established by the intersection of demand and supply. *See In re NJOY Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1119 (C.D. Cal. 2015) ("The ultimate price of a product is a combination of market demand and market supply."). Accordingly, a damages model that "examines only what consumers say they would be willing to pay" but "ignores the 'supply' part of the supply/demand curve" "does not actually calculate a market price premium." *In re Volkswagen "Clean Diesel" Mktg., Sales Practices, & Prods. Liab. Litig.*, 500 F. Supp. 3d 940, 949 (N.D. Cal. 2020), *aff'd sub nom. Schell v. Volkswagen AG*, 2022 WL 187841 (9th Cir. Jan. 20, 2022).

A conjoint survey "is a statistical technique capable of using survey data to determine how consumers value a product's individual attributes – often called the market's willingness to pay." *In re NJOY*, 120 F. Supp. 3d at 1118. But "willingness-to-pay does not necessarily reflect the actual price that a consumer ends up paying for a product." *In re Gen. Motors Ignition Switch Litig.*, 407 F. Supp. 3d 212, 235

(S.D.N.Y. 2019). A conjoint survey "focuses only on changes to the demand side of the equation." *Id*. As a consequence, numerous courts have held that a damages model that fails to evaluate such supply-side factors as the defendant's willingness to sell at a particular price is incapable of establishing a "price premium." *See, e.g., Passman v. Peloton Interactive, Inc.*, 671 F. Supp. 3d 417, 465 (S.D.N.Y. 2023) ("By neglecting to account for changes in supply, Named Plaintiffs have failed to present a model that measures only damages attributable to their theory of injury."); *In re NJOY*, 120 F. Supp. 3d at 1122 (finding conjoint analysis "deficient under *Comcast*" because it "is divorced from the marketplace. A consumer's subjective valuation of the [challenged] message, measured by their relative willingness to pay for products with or without the message, is not an accurate indicator of [ ] damages, because it does not permit the court to calculate the *true market price* of [the product] absent the purported misrepresentations") (emphasis in original); *In re Gen. Motors*, 407 F. Supp. 3d at 236 (plaintiffs' "conjoint analysis does not provide competent proof of damages" because it did not analyze GM's willingness to sell at different price points). A damages model is even more deficient where, as here, it assumes that

the seller will reduce prices in the "but for" world to maintain the current volume of sales. *See In re Gen. Motors*, 407 F. Supp. 3d at 239 ("an assumption of inelastic supply would be 'fundamentally flawed' because it would 'mean[] that a given product is supplied by the manufacturer in the same quantity no matter what the price is") (alteration in original).

The undisputed evidence before the District Court was that was that Sazerac *would not* and *could not* decrease the price of malt-based Southern Comfort, even if demand decreased. Sazerac's chairman and former CEO explained that there were several reasons for this, including the significantly greater cost of producing the malt version of Southern Comfort than the spirit-based version, the fact that Sazerac line-priced both malt-based and spirit-based versions of its 50 ml and 100 ml products, and the desire to avoid raising the ire of Sazerac's spirits distributors, who would view a reduced price for malt-based Southern Comfort as undercutting their prices for spirit-based Southern Comfort. This alone defeats the premise of a "price premium:" even if the label were to change, and even if the price were to drop, the price

would not change.[4]  Dr. Ingersoll did not consider any of this, or any other supply-side factors, in his "price premium" analysis.  Instead, he conceded that he merely assumed that Sazerac would reduce prices to maintain a constant volume of sales in the "but for" world in which an explicit "this is not whiskey" label allegedly decreased demand.[5]

The District Court, however, concluded that Dr. Ingersoll had "account[ed] for supply-side factors" because he had used "historical pricing data."  Dkt. 91 at 13.  Dr. Ingersoll, however, did *not* use historical pricing data with respect to any supply-side factors; he used such data *only for the purpose of setting prices in his conjoint survey –* which, as discussed above, is only a measure of willingness to pay.

---

[4]     Dr. Reibstein explained that this was an entirely rational strategy for Sazerac. Dkt. 77-5 at 68 – 71.

[5]     Dr. Reibstein provided an example to demonstrate why Dr. Ingersoll's assumption is misplaced:  "While demand is certainly one factor that affects the price that a company charges for its product, it is by no means the only factor.  Dr. Ingersoll does not account for the fact that price is also a function of costs, which depends upon the costs it incurs to obtain the product from the distributor and other costs.  Whether the retailer choses to decrease the price depends upon its margins.  For example, if the retailer's unit cost (a supply-side factor) was $0.92, it is unlikely that it would lower its price to $0.88 and lose money on every unit they sold."  Dkt. 77-5 at 58.

18

Merely using "historical pricing data" in some capacity does not equate to evaluating supply-side factors.

The District Court nonetheless found Dr. Ingersoll's limited use of "historical pricing data" sufficient because, according to the court, "most courts . . . have found that relying on historical pricing data is sufficient to account for supply-side factors in a 'classic mislabeling' case." Dkt. 91 at 13. The use of "historical pricing data" in the cases cited by the District Court, however, is vastly different from Dr. Ingersoll's use of pricing data. The District Court's quotation from *In re Gen. Motors* makes the point:

> A conjoint survey that asks respondents whether they would rather pay *x* for a product labeled "100% Fruit Juice" or *y* for a similar product labeled "50% Fruit Juice," for example, would account for supply-side factors if both *x* and *y* reflect the prices for which juice companies actually sell similarly labeled products in the marketplace.

Dkt. 91 at 13 (quoting *In re Gen. Motors*, 407 F. Supp. 3d at 239). It is true that if pricing data exists for the *same product* with two different labels, supply and demand would both be reflected in the real-world prices for the two variants of that product. But that situation does not exist here, where *x* (the average retail price of malt-based Southern Comfort with the existing label) is known, but *y* (the price of malt-based

19

Southern Comfort with a "this is not whiskey" label) is not. Here, Dr. Ingersoll attempts to impute $y$ based solely on consumers' alleged willingness to pay. In no sense is the use of historical pricing data solely to determine *demand* "sufficient to account for supply-side factors." For this reason, too, the District Court's certification of the class is therefore questionable.

## II. PERMISSION TO APPEAL SHOULD BE GRANTED TO ADDRESS LEGAL QUESTIONS ABOUT WHICH THERE IS A COMPELLING NEED FOR IMMEDIATE RESOLUTION.

In *Sumitomo*, this Court explained that a class certification order compelled immediate review if it "is of fundamental importance to the development of the law of class actions and it is likely to escape effective review after entry of final judgment." *Sumitomo*, 262 F.3d at 140. This is such a case.

As the District Court's own citations make plain, plaintiffs frequently proffer conjoint surveys to posit a class-wide measure of damages in the form of an alleged "price premium." Dkt. 91 at 11 – 13. Yet courts reach wildly divergent conclusions as to whether a conjoint survey alone – without analysis of supply-side factors – is sufficient to establish a price premium. *See, e.g., In re Kind LLC "Healthy & All*

*Nat." Litig.*, 337 F.R.D. 581, 606 (S.D.N.Y. 2021) ("courts are split as to whether a conjoint analysis on its own can adequately isolate a premium price") (collecting cases). The District Court's own discussion of supply-side factors highlights the lack of consistent application of Comcast to "price premium" models:

> Sazerac is correct that some courts have rejected conjoint analyses as evidence of a price premium on the ground that they "measure[] consumers' private valuations" of a product and not "the *market value* of" the product itself. "However, courts have also found that conjoint analyses can adequately account for supply-side factors – and can therefore be utilized to estimate price premia without running afoul of Comcast – when (1) the prices used in the surveys underlying the analyses reflect the actual market prices that prevailed during the class period; and (2) the quantities used (or assumed) in the statistical calculations reflect the actual quantities of products sold during the class period."

Dkt. 91 at 12 (internal citations omitted) (emphasis in original).

It is important for this Court to clarify whether a class may be certified when the only measure of class-wide damages is a "price premium" analysis focused solely on consumers' willingness to pay, without regard for the supply side of the equation. Otherwise, whether a class is certified will continue to be a "luck of the draw" proposition depending on whether an individual court considers the mere use of

"historical price data" in a conjoint survey to satisfy the need to account for supply-side factors.

Immediate review of this question is necessary because, as discussed above, the combination of statutory damages under New York law and the class action mechanism results in "a distortion [that] could create a potentially enormous aggregate recovery for plaintiffs, and thus an *in terrorem* effect on defendants," *Parker*, 331 F.3d at 22, compelling settlements that foreclose review by this Court. Absent immediate review, this critical question will go unanswered, perpetuating the divergent approaches of the District Courts in this Circuit.

## CONCLUSION

For the reasons set forth above, Sazerac respectfully requests that this Court grant it permission to appeal from the District Court's order granting Plaintiffs' motion for class certification.

Respectfully submitted,

Date: January 16, 2025

*/s/ Creighton R. Magid*
Creighton R. Magid
Christopher G. Karagheuzoff
DORSEY & WHITNEY LLP
51 West 52nd Street
New York, NY 10019-6119
magid.chip@dorsey.com
karagheuzoff.christopher@dorsey.com
Telephone: (212) 415-9200
Facsimile (212) 953-7201

## CERTIFICATE OF SERVICE

I HEREBY CERTIFY that on this 16th day of January, 2025, a true and correct copy of the foregoing PETITION FOR PERMISSION TO APPEAL UNDER FEDERAL RULE OF CIVIL PROCEDURE 23(f) was served on all counsel of record via this Court's CM/ECF electronic filing system. Participants in the case who are registered CM/ECF users will be served by the appellate CM/ECF system.

*/s/ Creighton R. Magid*
Creighton R. Magid

## Certificate of Compliance With Type-Volume Limit, Typeface Requirements, and Type-Style Requirements

1. This document complies with Fed. R. App. P. 5(c)(1) because, excluding the parts of the document exempted by Fed. R. App. P. 32(f), this document contains 4,473 words.

2. This document complies with the typeface requirements of Fed. R. App. P. 32(a)(5) and the type-style requirements of Fed. R. App. P. 32(a)(6) because it has been prepared in a proportionally spaced typeface using Microsoft Word in 14 point Century Schoolbook type.

Date: January 16, 2025

*/s/ Creighton R. Magid*
Creighton R. Magid
Christopher G. Karagheuzoff
DORSEY & WHITNEY LLP
51 West 52nd Street
New York, NY 10019-6119
magid.chip@dorsey.com
karagheuzoff.christopher@dorsey.com
Telephone: (212) 415-9200
Facsimile (212) 953-7201

UNITED STATES DISTRICT COURT
SOUTHERN DISTRICT OF NEW YORK

| | |
|---|---|
| WILBERT ANDREWS and STEVEN KHAN, individually and on behalf of all others similarly situated,<br><br>                             Plaintiffs,<br><br>           -against-<br><br>SAZERAC COMPANY, INC.,<br><br>                       Defendant. | 23-cv-1060 (AS)<br><br><u>OPINION AND ORDER</u> |

ARUN SUBRAMANIAN, United States District Judge:

Wilbert Andrews and Steven Khan bring this putative class action against Sazerac Company, Inc., the company behind Southern Comfort whiskey. Plaintiffs say that Sazerac deceived consumers by selling a malt beverage that looks like Southern Comfort whiskey but in fact contains only "whiskey flavor." Plaintiffs move to certify a class of "[a]ll persons who purchased the Southern Comfort Malt Products in the State of New York at any time during the period February 8, 2020, to the date of judgment." Dkt. 68 at 8. For the following reasons, the motion is GRANTED IN PART. The Court certifies the class, but only Khan may proceed as its named representative.

## BACKGROUND

Sazerac "manufactures, packages, labels, markets, and sells fruit and spice flavored liqueur under the Southern Comfort brand." Dkt. 64 ¶ 1. In the last few years, Sazerac has begun selling a Southern-Comfort branded "malt beverage" in gas stations, drug stores, and grocery stores, where liquor laws prevent it from selling whiskey. Dkt. 68 at 1.

The malt beverage comes in three sizes: 50ml, 100ml, and 355ml. Dkt. 75-6 ¶ 5. The 50ml bottle is cylindrical, while the two larger sizes are relatively flat. *Id.* ¶¶ 5-6. But each shares what plaintiffs say are "deceptive elements." Dkt. 84 at 2. The "colors, themes, fonts, symbols[,] and spacing" on the malt-beverage bottles are identical to Southern Comfort whiskey bottles. Dkt. 64 ¶ 15. In plaintiffs' view, the similarities between the two products "create[] an overall misleading impression" that the malt beverage contains distilled spirits. *Id.* ¶ 24. Further, each malt-beverage bottle has a statement of composition, which until April 2023 described the drink as a "malt beverage with natural whiskey flavors, caramel color and oak extract." *Id.* ¶ 16 (capitalization omitted); *see also* Dkt. 78 at 3. Plaintiffs say that the inclusion of the "whiskey flavors" and "oak extract" language contributed to this misleading impression. Dkt. 64 ¶¶ 22-23.

In February 2023, Christina Del Rosario sued Sazerac on behalf of a putative class of malt-beverage purchasers. Dkt. 1. Sazerac moved to dismiss Del Rosario's claims to the extent that they

were based on the "whiskey flavors" and "oak extract" phrases, arguing that federal regulations required their use. Dkt. 39-1 at 1. The Court denied the motion to dismiss after holding that Sazerac had not met its "heavy" burden of showing that Del Rosario's claims were preempted by federal law. *See Del Rosario v. Sazerac Co.*, 2023 WL 6318083, at *2-3 (S.D.N.Y. Sept. 28, 2023).

In February 2024, the Court granted leave to amend the complaint to replace Del Rosario as plaintiff. Dkt. 63. In the second amended complaint, Andrews and Khan sue Sazerac under sections 349 and 350 of the New York General Business Law ("GBL"), which prohibit consumer deception and false advertising. *See* Dkt. 64 ¶¶ 62-83. Now, after the close of discovery, plaintiffs move for class certification under Federal Rule of Civil Procedure 23.[1] Dkt. 71.

## LEGAL STANDARDS

Federal Rule of Civil Procedure 23 governs class actions. "To maintain a class action, plaintiffs must demonstrate that '(1) the class is so numerous that joinder of all members is impracticable; (2) there are questions of law or fact common to the class; (3) the claims or defenses of the representative parties are typical of the claims or defenses of the class; and (4) the representative parties will fairly and adequately protect the interests of the class.'" *Elisa W. v. City of New York*, 82 F.4th 115, 122 (2d Cir. 2023) (quoting Fed. R. Civ. P. 23(a)). "These requirements are known as numerosity, commonality, typicality, and adequate representation." *Id.*

"In addition to satisfying these requirements, plaintiffs must . . . show that one of the three conditions of Rule 23(b) is met." *Id.* Here, plaintiffs must show that "questions of law or fact common to class members predominate over any questions affecting only individual members" and a "class action is superior to other available methods for fairly and efficiently adjudicating the controversy." Fed. R. Civ. P. 23(b)(3). The plaintiff bears the burden of proving these requirements, which are known as "predominance" and "superiority," by a preponderance of the evidence. *See In re Petrobras Sec.*, 862 F.3d 250, 260 (2d Cir. 2017).

## DISCUSSION

### I.    Standing

As a threshold issue, Sazerac argues that Andrews lacks standing because he never bought the malt beverage. Dkt. 78 at 8-9. Sazerac points to Andrews's deposition testimony, in which he testified that he bought "spirit whiskey," not the malt beverage. Dkt. 75-13 at 8-9. Further, Andrews repeatedly testified that he bought a product called "Sazerac smooth beverage" with a dark red label, but the malt beverage's labels are "mostly white." Dkt. 78 at 9; *see also* Dkt. 75-13 at 4. Andrews responds by pointing to a different portion of his deposition testimony, in which

---

[1] On Sazerac's motion to dismiss, the parties focused on the misleading nature of the "whiskey flavor" and "oak extract" statements made on the bottles' labeling. But plaintiffs' proposed class definition includes people who purchased the malt beverage after the label was changed around April 2023 to omit these phrases, *see* Dkt. 78 at 3, and plaintiffs' class certification argument is based primarily on other similarities between the malt and whiskey bottles. Neither side mentions this change in plaintiffs' theory of the case, so the Court doesn't factor it into its class certification analysis.

Andrews's counsel put the malt bottle in front of him and asked him whether it was the product he bought, and Andrews said yes. *See* Dkt. 84-2 at 9-10. He also points out that he testified that he bought the "Sazerac smooth beverage" at a convenience store, where whiskey products aren't sold. *See* Dkt. 84 at 1; Dkt. 84-2 at 8.

After reviewing the deposition excerpts, the Court finds it unclear whether Andrews did in fact purchase the malt beverage. But the Court need not resolve this issue to get to the merits. "To establish Article III standing in a class action, . . . there must be at least one named plaintiff who can assert a claim directly against th[e] defendant, and at that point standing is satisfied and . . . the inquiry shift[s] to a class action analysis." *Central States S.E. & S.W. Areas Health & Welfare Fund v. Merck-Medco Managed Care, L.L.C.*, 504 F.3d 229, 241 (2d Cir. 2007) (quoting 1 Alba Conte & Herbert B. Newberg, *Newberg on Class Actions* § 2:6 n.3 (4th ed. 2002)); *see also Amador v. Andrews*, 655 F.3d 89, 99 (2d Cir. 2011) ("[A] class action cannot be sustained without a named plaintiff who has standing."). So "only one of the named [p]laintiffs is required to establish standing in order to seek relief on behalf of the entire class." *Central States*, 504 F.3d at 241. Sazerac hasn't challenged Khan's standing, so the Court proceeds to the Rule 23 analysis.

## II.    Numerosity

The parties do not dispute that plaintiffs have satisfied Rule 23(a)'s numerosity requirement. "[N]umerosity is presumed at a level of 40 members," *Consolidated Rail Corp. v. Town of Hyde Park*, 47 F.3d 473, 483 (2d Cir. 1995), but evidence of "exact class size or identity of class members" is not required, *Robidoux v. Celani*, 987 F.2d 931, 935 (2d Cir. 1993). Sales data obtained in discovery shows that Sazerac sold tens of thousands of units of malt beverage in New York during the relevant period, Dkt. 68 at 10, which suggests that many more than forty people would be part of the class.

## III.   Commonality

"To satisfy commonality, plaintiffs must affirmatively demonstrate by a preponderance of the evidence that there are questions of law or fact common to the class." *Elisa W.*, 82 F.4th at 122-23. "[C]ommonality turns on the ability of the action to 'generate common *answers* apt to drive the resolution of the litigation.'" *Id.* at 123 (quoting *Wal-Mart Stores, Inc. v. Dukes*, 564 U.S. 338, 350 (2011)). "Thus, commonality exists if there is a question such that 'determination of its truth or falsity will resolve an issue that is central to the validity of each one of the claims in one stroke.'" *Id.* (quoting *Wal-Mart*, 564 U.S. at 350). However, "claims for relief need not be identical for them to be common; rather, Rule 23(a)(2) simply requires that there be issues whose resolution will affect all or a significant number of the putative class members." *Johnson v. Nextel Commc'ns Inc.*, 780 F.3d 128, 137 (2d Cir. 2015).

"Commonality often depends on a plaintiff's theory of liability." *Sharpe v. A&W Concentrate Co.*, 2021 WL 3721392, at *3 (E.D.N.Y. July 23, 2021). Plaintiffs' theory of liability against Sazerac is premised on sections 349 and 350 of New York's General Business Law. *See* Dkt. 64 ¶¶ 62-83. "To successfully assert a claim under either section, 'a plaintiff must allege that a

defendant has engaged in (1) consumer-oriented conduct that is (2) materially misleading and that (3) plaintiff suffered injury as a result of the allegedly deceptive act or practice.'" *Orlander v. Staples, Inc.*, 802 F.3d 289, 300 (2d Cir. 2015) (quoting *Koch v. Acker, Merrall & Condit Co.*, 967 N.E.2d 675, 675 (N.Y. 2012)). Andrews and Khan say that their theory of liability raises two questions common to the class: whether Sazerac's conduct was "consumer-oriented" and whether it was "materially misleading." Dkt. 68 at 11-12.

Sazerac doesn't dispute that whether its conduct was "consumer-oriented" is a question common to the class. *See Sharpe*, 2021 WL 3721392, at *6 (concluding that "*all* elements of liability [under the GBL]—the consumer-oriented conduct, the materially misleading statement, and the resulting injury—will depend on classwide proof"). And this admission alone is sufficient to satisfy Rule 23(a)'s commonality requirement. *See Wal-Mart*, 564 U.S. at 359 ("For purposes of Rule 23(a)(2) even a single common question will do." (cleaned up) (citation omitted)).

But Andrews and Khan are also right that the "materially misleading" prong does the trick. In interpreting sections 349 and 350 of the GBL, "[t]he New York Court of Appeals has adopted an objective definition of 'misleading,' under which the alleged act must be 'likely to mislead a reasonable consumer acting reasonably under the circumstances.'" *Orlander*, 802 F.3d at 300 (alteration in original) (quoting *Cohen v. JP Morgan Chase & Co.*, 498 F.3d 111, 126 (2d Cir. 2007)). When an issue is "objective," it "can be proved through evidence common to the class." *Amgen Inc. v. Conn. Ret. Plans & Tr. Funds*, 568 U.S. 455, 467 (2013). So "where the consumer protection statute at issue supplies an objective test, such claims are considered 'ideal for class certification' because they allow the court to adopt classwide presumptions of reliance and do not require an investigation into 'class members' individual interaction with the product.'" *Ackerman v. Coca-Cola Co.*, 2013 WL 7044866, at *10 (E.D.N.Y. July 18, 2013) (citation omitted).

Sazerac objects that plaintiffs don't have classwide proof that the bottles' labeling was materially misleading. The company says that a survey conducted by Dr. Andrea Matthews, which found that 62.9% of consumers believed that the malt-beverage mini bottles contained whiskey, doesn't "support[] the notion that the [malt] packaging was deceptive" because the survey was fatally flawed. Dkt. 78 at 10; *see* Dkt. 71-35 ¶ 32. And in any event, Sazerac says that the survey shows only that the packaging of the 50ml bottles is materially misleading because Matthews showed these small bottles, but not the 100ml and 355ml bottles, to survey respondents. Dkt. 78 at 10-11. Sazerac says that the 100ml and 355ml bottles differ from the 50ml bottles in material ways: the 50ml bottle is cylindrical, while the larger bottles have "relatively flat front[s]," and the statement of composition, which says that the drink contains "malt beverage," appears in larger font on the bigger bottles. Dkt. 75-6 ¶¶ 5-6; *see also* Dkt. 78 at 10-11. Sazerac argues that these differences "require an independent assessment of whether each bottle type would mislead a reasonable consumer." Dkt. 78 at 11.

To be sure, in the fraud context, class certification is "improper" when "there are material variations in the nature of the misrepresentations made to each member of the proposed class." *Moore v. PaineWebber, Inc.*, 306 F.3d 1247, 1253 (2d Cir. 2002). Assuming this principle applies with equal force in the deceptive-advertising context, *see Passman v. Peloton Interactive, Inc.*, 671

F. Supp. 3d 417, 439 (S.D.N.Y. 2023) ("At most, th[is] case[] support[s] the proposition that when there are different allegedly false statements, there can be no single 'reasonable consumer' for materiality purposes across all different statements."), Sazerac doesn't explain why the two variations it points to are material. That the larger bottles are flat, instead of round, might be material if their shape would tend to indicate to reasonable consumers that the bottles contain malt beverage, not whiskey. But Sazerac doesn't say that its whiskey is only sold in round bottles, so it's not clear why the bottle shape makes a difference here. Sazerac's observation that the statement of composition appears in larger font on the larger bottles seems similarly irrelevant. On the one hand, "malt beverage" is in larger font. But so too were the allegedly misleading "whiskey flavor" and "oak extract" phrases, at least until April 2023. Regardless, the Court sees no reason why the impression created by a specific combination of elements on a small bottle would vary "significantly" from the impression created by those same elements on a larger bottle. *See Singleton v. Fifth Generation, Inc.*, 2017 WL 5001444, at 17 n.17 (N.D.N.Y. Sept. 17, 2017) (holding that claims based on misrepresentations that "appear to have varied significantly" were "not suitable for class treatment").

Further, whether plaintiffs can succeed on their claim that the product's packaging is materially misleading goes to the merits, not to class certification. *See Allegra v. Luxxotica Retail N. Am.*, 341 F.R.D. 373, 439 (E.D.N.Y. 2022) (rejecting argument that plaintiffs "lack[ed] classwide evidence that the reasonable consumer would interpret, and therefore be deceived by, the Alleged Misrepresentations" as an attempt to "have the Court prematurely and improperly resolve merits questions at the class certification stage"); *see also Passman*, 671 F. Supp. 3d at 452 ("Named Plaintiffs are not required to proffer at this stage the evidence that they will offer at trial to show that the Challenged Statement would be material to a reasonable consumer."). For now, "[i]t is sufficient that the answer to the question of whether the [packaging] was material with respect to one member of the class will be identical with respect to every member of the class." *Passman*, 671 F. Supp. 3d at 452; *see also id.* ("If the evidence offered by [plaintiffs] fails to persuade the factfinder that the [packaging] would be material to a reasonable consumer, that conclusion will be binding on all putative class members.").

The two cases that Sazerac relies on to support its position to the contrary are easily distinguished. In *McKinnon v. Dollar Thrifty Automotive Group, Inc.*, 2015 WL 4537957 (N.D. Cal. July 27, 2015), the court found that there was no commonality in a suit against a rental car company under California's Unfair Competition Law (UCL) and Consumer Legal Remedies Act (CLRA), based on the company's sale of liability coverage. *Id.* at *1, *9. There, plaintiffs' proposed class definition included individuals "who were not injured because they were not deceived or because they benefited from the additional [liability] coverage," so determining whether a class member was harmed by Dollar's practices would have required individualized inquiries into each member's interactions with the company. *Id.* at *9. And the court characterized the plaintiffs' claims as turning on "what particular agents said to particular customers," such that the alleged facts "apply only to some customers, at some locations, some of the time." *Id.* That's not this case, which isn't based on one-to-one customer interactions, but rather common allegedly

deceptive features on Sazerac's malt-beverage bottles. And to the extent that the *McKinnon* court's holding was based on confounding reliance issues, "sections 349 and 350 of the GBL do not contain a viewing requirement or a reliance requirement, nor do they require individual determination of how a particular advertisement affected each putative class member." *See Hasemann v. Gerber Prods. Co.*, 331 F.R.D. 239, 274 (E.D.N.Y. 2019). In other words, there's no need to determine whether individual consumers were actually deceived; that's the whole point of the objective "reasonable consumer" test, which doesn't ask whether each consumer *in fact* found the product misleading.

*Rivera v. Harvest Bakery Inc.*, 312 F.R.D. 254 (E.D.N.Y. 2016), is even farther afield. There, the court declined to certify a class of "all persons who work or have worked" for Harvest Bakery because the class claims were based on allegations that the bakery didn't pay hourly workers their overtime wages. *Id.* at 268. But the class definition would bring in non-hourly employees who were exempt from overtime, so the court amended the class definition to "all current and former non-exempt hourly employees who worked for the [bakery]." *Id.* Here, the class definition isn't overbroad because it includes only purchasers of the allegedly deceptive product. Again, whether plaintiffs can actually prove that the product's packaging is misleading is a separate question.

## IV.    Typicality and Adequacy

"Typicality requires that the claims of the class representatives be typical of those of the class, and is satisfied when each member's claim arises from the same course of events, and each class member makes similar legal arguments to prove the defendant's liability." *Elisa W.*, 82 F.4th at 128 (citation omitted). Sazerac says that Andrews's claim isn't "typical" because he is subject to the unique defense that he lacks standing. Dkt. 78 at 12. As to Khan, Sazerac says that his claim isn't "typical" because he didn't purchase a 50ml bottle. *Id.* at 12-13. In Sazerac's view, these "unique defenses" also make Andrews and Khan inadequate class representatives. *See Gary Plastic Packaging Corp. v. Merrill Lynch, Pierce, Fenner & Smith, Inc.*, 903 F.2d 176, 180 (2d Cir. 1990) ("Regardless of whether the issue is framed in terms of the typicality of the representative's claims . . . or the adequacy of its representation, . . . there is a danger that absent class members will suffer if their representation is preoccupied with defenses unique to it."), *abrogated by Microsoft Corp. v. Baker*, 582 U.S. 23 (2017).

The Court disagrees that Khan isn't a typical or adequate representative. The typicality requirement, which is "not demanding," *Kaplan v. S.A.C. Cap. Advisors, L.P.*, 311 F.R.D. 373, 379 (S.D.N.Y. 2015) (citation omitted), is usually met "[w]hen it is alleged that the same unlawful conduct was directed at or affected both the named plaintiff and the class sought to be represented, . . . irrespective of minor variations in the fact patterns underlying individual claims." *Robidoux*, 987 F.2d at 936-37. For this reason, "[d]ifferences in amounts or characteristics of the class representatives' purchases do not defeat typicality." *Dial Corp. v. News Corp.*, 314 F.R.D. 108, 114 (S.D.N.Y. 2015). Khan's "unique defense," i.e., purchasing one of the larger bottles, is simply a purchasing variation and so doesn't defeat typicality or adequacy. *See In re Sumitomi*

*Copper Litig.*, 182 F.R.D. 85, 94 (S.D.N.Y. 1998) (collecting cases where class was certified despite "variation in fact among class members").

The Court agrees, however, that Andrews isn't an adequate class representative, given his confusing and contradictory deposition testimony. When considering a class representative's adequacy, "courts may consider the honesty and trustworthiness of the named plaintiff." *Savino v. Comput. Credit, Inc.*, 164 F.3d 81, 87 (2d Cir. 1998). Courts have denied class certification "where the putative class representatives display 'an alarming unfamiliarity with the suit' . . . or are so lacking in credibility that they are likely to harm their case." *In re Frontier Ins. Grp., Inc. Sec. Litig.*, 172 F.R.D. 31, 47 (E.D.N.Y. 1997) (citations omitted).

That's the case here. In his deposition, Andrews appeared not to know the basic premise of the case:

Q: [W]hen I asked you earlier, you were unaware of the fact that there were two versions of Southern Comfort, . . . one a spirit whiskey and one a malt beverage, right?

A: Right.

Q: This was news to you today, correct?

A: Yes.

Dkt. 84-2 at 10-11. He also testified several times that he purchased the whiskey version of Southern Comfort, not the malt beverage:

Q: You told me earlier that the version that said "spirit whiskey" is what you purchased and then you affirmed it. That's what you purchased, right?

A: Yes.

*Id.* at 11. Finally, in response to questioning, Andrews admitted that he lied in his interrogatory answers and signed what his lawyers put in front of him without reading it:

Q: [T]he answer to interrogatory number 1, subpart E, says that you paid a dollar fifty for each of the bottles that you purchased; that's not a true statement, is it?

A: No.

Q: Well, if that wasn't a true statement, why did you sign this document under penalty of perjury?

A: When I had got this document, they asked me to sign it.

Q: But you read it before you signed it, didn't you?

A: I read some of it.

Q: Well, if you're swearing that something is true under penalty of perjury . . . you would want to make sure before you signed it that it was true, right?

A: Yes.

Q: So what did you do if . . . you just signed it even though you knew it was not true?

A: The, umm—the email said that it was the document that I had had to sign, so I had—I had signed it right—right away.

Q: Without looking at it?

A: Yes. I only looked at the, umm, e-mail . . . that I had.

Dkt. 75-13 at 5-6.

Andrews can't adequately represent a class when he doesn't know the basic premise of the suit, can't give straightforward testimony about whether he bought the product at issue, and admitted to lying in his interrogatory answers. *See Panzirer v. Wolf*, 663 F.2d 365, 368 (2d Cir. 1981) (affirming inadequacy of named representative where plaintiff "gave no less than four versions of her conversation with her broker" so her "lack of credibility [was] abundantly clear in the record"), *vacated as moot sub nom. Price Waterhouse v. Panzirer*, 459 U.S. 1027 (1982). So only Khan can proceed as class representative.

## V.   Predominance

The predominance requirement is satisfied "if resolution of some of the legal or factual questions that qualify each class member's case as a genuine controversy can be achieved through generalized proof, and if these particular issues are more substantial than the issues subject only to individualized proof." *Roach v. T.L. Cannon Corp.*, 778 F.3d 401, 405 (2d Cir. 2015) (quoting *In re U.S. Foodservice Inc. Pricing Litig.*, 729 F.3d 108, 118 (2d Cir. 2013)).

### A.   Materially Misleading

Sazerac first says the common issues here don't predominate because whether the larger bottle sizes misled consumers will "need to be resolved by individual inquiries." Dkt. 78 at 14. Again, Sazerac misunderstands the "materially misleading" inquiry under sections 349 and 350 of the GBL. There is one product at issue in this case, which comes in three different bottle sizes. The primary difference between the 50ml bottles and the bigger bottles is that the bigger bottles are flat. In addition, the "statement of composition," which describes the drink as a "malt beverage," appears in larger font on the larger bottles. But each bottle "has the same [allegedly] deceptive elements." Dkt. 84 at 2. Specifically, all three sizes use branding elements identical to Southern Comfort whiskey, including colors, font, iconography, and taglines, and they all contain the same statement of composition. *See Taylor v. Am. Bankers Ins. Grp., Inc.*, 700 N.Y.S.2d 458, 459 (1st Dep't 1999) (upholding class certification under the GBL where plaintiffs challenged a "general practice" of offering insurance coverage while "relegating to small, inconspicuous print the precise terms of the coverage being extended," despite the "variety of forms and promotions" used by defendants). If a jury finds that the combination of these elements would mislead a reasonable consumer to think that they were buying Southern Comfort whiskey, instead of its malt beverage, then the issue is resolved for the entire class. There's no "individual inquiry" necessary.

Sazerac urges this Court to reach a different conclusion based on *Goldemberg v. Johnson & Johnson Consumer Cos., Inc.*, 317 F.R.D. 374 (S.D.N.Y. 2016). There, the court considered

whether a suit based on the misleading nature of Aveeno's "Active Naturals" line was amenable to class treatment. The court certified the class but created "subclasses based on the Aveeno Active Naturals product at issue." *Id.* at 403. "By grouping the determination by product," the court explained, "there are less issues implicating individual class member's particular situations":

> Assuming the product and its labeling and packaging remains constant and is uniform between consumers, then the only question is how such packaging would have influenced a consumer under the objective test. . . . But, if it is not demonstrated that "all members of the class saw the same advertisements" or if the content of the "advertising varied widely and not all the advertisements contained the alleged misrepresentations," then "questions of individual members' exposure to the allegedly deceptive advertising [would] predominate" on those claims.

*Id.* at 389 (alteration in original) (quoting *Solomon v. Bell Atl. Corp.*, 777 N.Y.S.2d 50, 53 (1st Dep't 2004)).

As courts in this circuit have recognized, however, the *Goldemberg* court relied on a New York appellate case to reach this conclusion that improperly "read an individualized reliance" inquiry into the GBL. *See Hasemann*, 331 F.R.D. at 266 ("*Goldemberg* is unpersuasive due to its reliance on a case that Defendant also relies upon, *Solomon*, which read an individualized reliance and causation inquiry into sections 349 and 350 of the GBL."). Even though New York courts have occasionally and incorrectly imposed such a reliance requirement, the New York Court of Appeals has stated unequivocally that "reliance is not an element of a section 349 claim." *See Stutman v. Chem. Bank*, 731 N.E.2d 608, 612 & n.1 (N.Y. 2000). So *Goldemberg*'s reasoning does not hold.

## B. Causation, Injury, and Damages

Even if the misleading nature of the packaging can be determined in one fell swoop, Sazerac says that the predominance requirement still isn't satisfied due to individual inquiries required to determine causation, injury, and damages for each class member. Dkt. 78 at 15. Plaintiffs respond with a proposed damages model that they say would negate the need for any individualized inquiry.

To succeed on a GBL claim, a plaintiff must show that they "suffered injury as a result of the allegedly deceptive act or practice." *Orlander*, 802 F.3d at 300 (quoting *Koch*, 967 N.E.2d at 675). "This prong may be satisfied through an allegation that a plaintiff overpaid for the product, or, stated differently, 'by a claim that a plaintiff paid a premium for a product based on [the] defendants' inaccurate representations.'" *Hasemann*, 331 F.R.D. at 258 (alteration in original) (quoting *Ackerman v. Coca-Cola*, 2010 WL 2925955, at *23 (E.D.N.Y. July 21, 2010)). So "[a]t the class certification stage, plaintiffs may demonstrate that [causation and injury under the GBL] are susceptible to generalized proof by disclosing a suitable methodology" to quantify this alleged price premium. *See Weiner v. Snapple Beverage Corp.*, 2010 WL 3119452, at *6 (S.D.N.Y. Aug. 5, 2010).

Plaintiffs propose to use a choice-based conjoint survey conducted Dr. William Robert Ingersoll, Dkt. 71-36, to prove the existence of a price premium. "In such a survey, respondents

are presented with a series of questions and asked to select 'the most preferred product among several available options with different attributes.'" *Allegra*, 341 F.R.D. at 451 (citation omitted). Ingersoll's survey tested four attributes: brand, alcohol type, size, and price. Dkt. 71-36 ¶ 34. The brand was either "Southern Comfort" or a generic alternative, and the "alcohol type" was either whiskey or malt. *Id.* After analyzing the results of his survey, Ingersoll concluded that "a belief that the alcohol type used [in a bottle of Southern Comfort] is Whisky (Distilled Spirit), when it was actually Malt, would result in 8.8% of the price being a price premium due to that belief. Without that belief, price for the product would have been reduced by 8.8% of that price for all purchasers." *Id.* ¶ 91. In other words, "purchasers faced a market price that should have been at least 8.8% lower had the deceptive label not been used." *Id.* ¶ 92.

As a threshold matter, Sazerac says that Ingersoll's opinion doesn't satisfy Federal Rule of Evidence 702, which governs the admissibility of expert evidence. *See* Dkt. 78 at 20. (It doesn't move to exclude his report under Rule 702, nor does it frame its objections under that rule.) "Although the Supreme Court has not definitely resolved 'the extent to which a district court must undertake a *Daubert* analysis at the class certification stage,' it has suggested in *dicta* that such an analysis is appropriate." *Molly C. v. Oxford Health Ins., Inc.*, 2024 WL 4850813, at *7 (S.D.N.Y. Nov. 21, 2024) (first quoting *In re U.S. Foodservice*, 729 F.3d at 129; and then citing *Wal-Mart*, 564 U.S. at 354). At the class certification stage, however, "the *Daubert* inquiry extends only to the issues 'necessary to the Rule 23 analysis.'" *Id.* (quoting *In re LIBOR-Based Fin. Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 471 (S.D.N.Y. 2018)). So "the Court need only consider the portions of [Ingersoll's] declaration[] relied on by plaintiffs to demonstrate [predominance]." *Id.*

As far as the Court can tell without any briefing from the parties on Rule 702, those portions of Ingersoll's proposed testimony are admissible. Ingersoll is a statistician, economist, and professor who has testified in numerous other cases. *See* Dkt. 71-36 at 23, 26. The survey methods and statistical analysis Ingersoll describes in his report are frequently used in calculating price premiums. *See, e.g., Sharpe*, 2021 WL 3721392, at *7-9. And although defendants object that Ingersoll failed to adequately define certain terms in the survey or limit the survey to Southern Comfort malt purchasers, *see* Dkt. 78 at 6-8, these arguments "ultimately go to the weight" of Ingersoll's model and so are "are fodder for cross-examination, not exclusion." *In re Scotts EZ Seed Litig.*, 2017 WL 3396433, at *8 (S.D.N.Y. Aug. 8, 2017) (citation omitted).

The next question is whether Ingersoll's model sufficiently demonstrates that damages can be measured by classwide proof. Here, plaintiffs must satisfy the requirements set forth in *Comcast Corp. v. Behrend*, 569 U.S. 27 (2013). *See, e.g., Allegra*, 341 F.R.D. at 457. "[T]o satisfy predominance under Rule 23(b)," *Comcast* requires that a plaintiff "put forth a damages model that measures 'only those damages attributable to [their] theory' of liability." *Id.* (alteration in original) (quoting *Comcast*, 569 U.S. at 35-37). Sazerac says that Ingersoll's analysis doesn't measure plaintiffs' theory of liability because it fails to (1) show that the price premium is attributable to the beverage's misleading packaging or (2) consider supply-side factors. The Court considers each argument in turn.

### 1. Failure to Isolate the Misrepresentation

Sazerac says that Ingersoll's analysis fails to account for two factors that are "the primary drivers of SoCo Malt purchase intent: flavor and convenience." Dkt. 78 at 17. Sazerac also says that by using the term "malt," Ingersoll "may well have measured relative preference for whiskey over beer or beverages that taste like beer." *Id.* at 16.

True, "[c]ourts routinely reject price premium methodologies under *Comcast* when the proposed methodologies do not attempt to isolate the premium due only to the allegedly misleading marketing statement." *Famular v. Whirlpool Corp.*, 2019 WL 1254882, at *11 (S.D.N.Y. Mar. 19, 2019). But Sazerac doesn't cite any cases that say a conjoint analysis must control for *external* factors like flavor and convenience to measure the existence of a price premium. In the cases cited by Sazerac, courts emphasize that conjoint analyses must accurately isolate the *product* features that are allegedly misleading. *See In re Scotts EZ Seed Litig.*, 304 F.R.D. 397, 413 (S.D.N.Y. 2015) ("[F]or plaintiffs' price premium model adequately to match their second theory of liability—that they were damaged when they paid a premium associated with the 50% thicker claim—[the expert] must control for *product features* other than the 50% thicker claim when calculating the price premium." (emphasis added)); *Singleton*, 2017 WL 5001444, at *22 (rejecting a proposed model that failed to "isolate the effect of" a certain representation "while accounting for other relevant *product attributes*" (emphasis added)). For example, in *Price v. L'Oréal USA*, 2021 WL 4459115 (S.D.N.Y. Sept. 29, 2021), the court rejected a conjoint analysis that combined "Keratindose" and "Pro-Keratin" with "+ Silk," because "the analysis d[id] not tell the Court whether the survey respondents would pay a price premium because the product is advertised as containing keratin, because it is advertised as containing silk[,] or a combination of the two." *Id.* at *5. Similarly, in *Passman*, the court rejected a conjoint analysis that isolated the price premium attributable to the phrase "ever-growing library of classes." 671 F. Supp. 3d at 459. The plaintiffs' theory was that consumers specifically derived value from the phrase "ever-growing." *Id.* The "model does not prove that theory," the court explained, "because it does not disentangle the library of classes that was Peloton's innovation from the fact that this library was 'ever-growing.'" *Id.*

Here, by contrast, plaintiffs don't challenge one feature of the malt-beverage packaging as misleading. Instead, in plaintiffs' view, consumers derived value from the overall Southern Comfort whiskey packaging. Ingersoll measured this value by using "Southern Comfort," the product brand, as a proxy for the Southern Comfort packaging, on the assumption that consumers were "deceived by the allegedly problematic labels." *See* Dkt. 71-36 ¶ 7, *see also id.* ¶ 37 ("The 'Product Brand' attribute . . . can be used to measure the brand effect of Southern Comfort versus an unknown brand."). Although this is a crude method, and despite the remote possibility raised by Sazerac that some respondents might have understood "malt" to refer to "beer," Ingersoll's model does not "indisputably 'fail[] to measure'" plaintiffs' theory of liability. *Sykes v. Mel S. Harris & Assocs. LLC*, 780 F.3d 70, 88 (2d Cir. 2015) (quoting *Comcast*, 569 U.S. at 36); *see also Allegra*, 341 F.R.D. at 458 ("Unconvincing as [defendants] may ultimately prove [a model based on a choice-based conjoint survey] to be, it does purport to measure damages attributable to Plaintiffs' theory of liability.").

### 2. Supply-Side Factors

Sazerac also argues that Ingersoll's model is fatally flawed because it measures only consumers' willingness to pay, and not the supply-side factors that impact a product's price. Dkt. 78 at 19; *see also In re NJOY, Inc. Consumer Class Action Litig.*, 120 F. Supp. 3d 1050, 1119 (C.D. Cal. 2015) (rejecting under *Comcast* a model that focused "solely on the consumer's subjective valuation" "without considering other factors in a functioning marketplace").

Again, Sazerac is correct that some courts have rejected conjoint analyses as evidence of a price premium on the ground that they "measure[] consumers' private valuations" of a product and not "the *market value* of" the product itself. *See In re Gen. Motors LLC Ignition Switch Litig.*, 407 F. Supp. 3d 212, 236-37 (S.D.N.Y. 2019) (collecting cases); *Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1105 (N.D. Cal. 2018) ("[I]n cases where price premia are the relevant measure of damages, courts have repeatedly rejected conjoint analyses that only measure demand-side willingness-to-pay."). "However, courts have also found that conjoint analyses can adequately account for supply-side factors—and can therefore be utilized to estimate price premia without running afoul of *Comcast*—when (1) the prices used in the surveys underlying the analyses reflect the actual market prices that prevailed during the class period; and (2) the quantities used (or assumed) in the statistical calculations reflect the actual quantities of products sold during the class period." *Hadley*, 324 F. Supp. 3d at 1105.

That's the case here. In designing his survey, Ingersoll used pricing data generated from "actual market transactions in New York," obtained from Circana, a consumer data company. Dkt. 71-36 ¶¶ 39-40, 43. "That empirical data 'tether[s]' [Ingersoll's] opinion 'to actual market conditions, including pricing and premiums.'" *Hasemann v. Gerber Prods. Co.*, 2024 WL 1282368, at *18 (E.D.N.Y. Mar. 25, 2024) (first alteration in original) (citation omitted).

Still, Sazerac's expert, David Reibstein, says that this historical pricing data is insufficient to account for supply-side factors. According to Reibstein,

> The actual prices included by Dr. Ingersoll in his conjoint survey reflect the equilibrium prices of Southern Comfort malt products given the set of marketplace offerings *in the actual world*. That is, these prices incorporate *historical* best responses of each competitor in the marketplace. However, . . . a competitor's optimal response (*i.e.*, the chosen price) may change once the set of competing product offerings changes. To determine the value of the challenged label, one needs to recompute the equilibrium price in a counterfactual world where the at-issue Southern Comfort products are no longer alleged to be deceptive.

Dkt. 77-5 ¶ 103.

Some courts have been receptive to this argument. In *Passman*, for example, the court rejected a conjoint analysis under *Comcast* because the model did not account for "the supply-side factors in the but-for world where Defendant did not use the Challenged Statement," nor did it "consider how competitors would have reacted to a decrease in demand for Peloton products, which could in turn affect the supply of Peloton products." 671 F. Supp. 3d at 465. But most courts, with which

this Court agrees, have found that relying on historical pricing data is sufficient to account for supply-side factors in a "classic mislabeling" case. *See In re Gen. Motors*, 407 F. Supp. 3d at 238-39 (collecting cases); *see also Sharpe*, 2021 WL 3721392, at *7-8 (explaining why historical data is particularly appropriate for mislabeling cases); *In re Folgers Coffee, Mktg. Litig.*, 2024 WL 4068851, at *6 n.12 (W.D. Mo. July 31, 2024) (declining to adopt *Passman*'s reasoning because the court "relied exclusively on the defendant's expert and did not address the many cases that have found historical sales and market data are sufficient"). After all, "[a] conjoint survey that asks respondents whether they would rather pay $x$ for a product labeled '100% Fruit Juice' or $y$ for a similar product labeled '50% Fruit Juice' . . . would account for supply-side factors if both $x$ and $y$ reflect the prices for which juice companies actually sell similarly labeled products in the marketplace." *In re Gen. Motors*, 407 Supp. 3d at 239.

In sum, Ingersoll's conjoint analysis "provides an acceptable, though likely imperfect" method of measuring the damages attributable to plaintiffs' theory of liability. *See Hasemann*, 2024 WL 1282368, at *18. So between this and the materiality prong, plaintiffs have carried their burden of showing that common questions predominate over individual ones.

## VI.    Superiority

Plaintiffs say that a class action is the "superior" method for "fairly and efficiently adjudicating the controversy," Fed. R. Civ. P. 23(b)(3), because "proceeding individually would be prohibitive for class members with small claims." *Seijas v. Republic of Argentina*, 606 F.3d 53, 58 (2d Cir. 2010). Sazerac doesn't object, and the Court agrees: when, like here, there are thousands of potential class members with small claims, and those claims are capable of resolution through classwide proof, "the class action device is . . . superior to individual actions." *See id.*

## CONCLUSION

For these reasons, the Court certifies a class of all persons who purchased the Southern Comfort malt products in the State of New York at any time during the period February 8, 2020, to the date of judgment. Khan's lawyers, Charles D. Moore, Neal Jamison Deckant, and Spencer Sheehan, are appointed as class counsel.

The Clerk of Court is directed to terminate the motion at Dkt. 71.

SO ORDERED.

Dated: January 2, 2025
New York, New York

_____
ARUN SUBRAMANIAN
United States District Judge