# 25-127-cv

**UNITED STATES COURT OF APPEALS
FOR THE SECOND CIRCUIT**

SAZERAC COMPANY, INC.,
*Defendant-Petitioner*,

v.

WILBERT ANDREWS and STEPHEN KAHN, individually and on behalf of all
others similarly situated persons,
*Plaintiffs-Respondents*.

Appeal from the United States District Court
for the Southern District of New York,
No. 1:23-cv-1060 (AS)

**RESPONDENTS' OPPOSITION TO PETITION FOR PERMISSION TO
APPEAL UNDER RULE 23(f)**

Neal Deckant
**Bursor & Fisher, P.A.**
1990 N. California Blvd
Walnut Creek, CA 94596
(925) 300-4455

Michael R. Reese
**Reese LLP**
100 West 93rd St., 16th Fl.
New York, NY 10025
(212) 643-0500

Spencer Sheehan
**Sheehan & Assoc.**
60 Cuttermill Rd., #412
Great Neck, NY 11021
(516) 268-7080

*Counsel for Plaintiffs-Respondents Wilbert Andrews and Stephen Kahn*

# <u>TABLE OF CONTENTS</u>

**PAGE(S)**

TABLE OF CONTENTS ........................................................................ i

TABLE OF AUTHORITIES ................................................................ ii

INTRODUCTION ............................................................................... 1

STATEMENT OF FACTS ................................................................... 2

LEGAL STANDARD ......................................................................... 4

ARGUMENT ...................................................................................... 5

    I.     There is No Evidence Certification will Terminate the Litigation, Nor that the Order is Questionable ................................................... 5

        A.    Sazerac Failed to Adduce Evidence that Certification will Terminate the Litigation ........................................................... 5

        B.    The Certification Order is Well Reasoned and Does Not Present Grounds for Immediate Review ............................................ 8

    II.    Sazerac Fails to Identify an Unsettled Legal Question that Would Escape Later Review ................................................................ 18

CONCLUSION .................................................................................. 21

CERTIFICATE OF COMPLIANCE.................................................. 22

## <u>TABLE OF AUTHORITIES</u>

**PAGE(S)**

## <u>CASES</u>

*Blair v. Equifax Check Servs.*,
181 F.3d 832 (7th Cir. 1999) .................................................................5

*Chamberlan v. Ford Motor Co.*,
402 F.3d 952 (9th Cir. 2005) .............................................................5, 6

*Comcast Corp. v. Berend*,
133 S.Ct. 1426 (2013) ........................................................8, 9, 10, 11

*Davidson v. Apple, Inc.*,
2018 WL 2325426 (N.D. Cal. May 8, 2018) .....................................15

*Fitzhenry-Russell v. Dr. Pepper Snapple Group, Inc.*,
2018 WL 3126385 (N.D. Cal. June 26, 2018) ...................................15

*Hadley v. Kellogg Sales Co.*,
324 F. Supp. 3d 1084 (N.D. Cal. 2018) ................................. 13, 14, 15

*Hasemann v. Gerber Prod. Co.*,
2024 WL 1282368 (E.D.N.Y. Mar. 25, 2024).................................. 13, 15, 16, 17

*Hevesi v. Citigroup Inc.*,
366 F.3d 70 (2d Cir. 2004) .................................................................20

*In re Dial Complete Marketing and Sales Practices Litigation*,
320 F.R.D. 326 (D.N.H. 2017)............................................................14

*In re Folgers Coffee, Mktg. Litig.*,
2024 WL 4068851 n.12 (W.D. Mo. July 31, 2024) ............................17

*In re Gen. Motors LLC Ignition Switch Litig.*,
407 F. Supp. 3d, 212 (S.D.N.Y. 2019) ........................................ 17, 18

*In re Lenovo Adware Litigation*,
2016 WL 6277245 (N.D. Cal. Oct. 27, 2016)......................................15

*In re LIBOR-Based Financial Instruments Antitrust Litig.*,
299 F. Supp. 3d 430 (S.D.N.Y. 2018) .................................................19

*In re Loraepam & Clorazepate Antitrust Litig.*,
    289 F.3d 98 (D.C. Cir. 2002) ................................................................6, 7

*In re MyFord Touch Consumer Litig.*,
    291 F. Supp. 3d 936 (N.D. Cal. 2018) ........................................ 14, 15

*In re Rail Freight Fuel Surcharge Antitrust Litig.*,
    725 F.3d 244 (D.C. Cir. 2013)................................................................7

*In re Sumitomo Copper Litig.*,
    262 F.3d 134 (2d Cir. 2001) ........................................ 1, 4, 5

*In re Visa Check/MasterMoney Antitrust Litig.*,
    280 F.3d 124 (2d Cir. 2001) ........................................ 7, 19

*In re Worldcom, Inc.*,
    2005 WL 1208527 (S.D.N.Y. May 20, 2005) ....................................18

*Kurtz v. Costco Wholesale Corp.*,
    818 F. App'x 57 (2d Cir. 2020) ................................................10, 11

*Monell v. Scooter Store, Ltd.*,
    895 F. Supp. 2d. 398 (N.D.N.Y. 2012)................................................20

*Passman v. Peloton Interactive, Inc.*,
    671 F. Supp. 3d 417 (S.D.N.Y. 2023) ................................................18

*Pryce v. Progressive Casualty Ins. Co.*,
    2022 WL 2467013................................................................................7

*Roach v. T.L. Cannon Corp.*,
    778 F.3d 401 (2d Cir. 2015) ................................................ 9, 10, 19

*Roseman v. Bloomberg*,
    2017 WL 5176379 (S.D.N.Y. Nov. 7, 2017)........................................8

*Sharpev. A&W Concentrate Co*,
    2021WL 3721392 (E.D.N.Y. July 23, 2021) ....................................17

*TransUnion LLC v. Ramirez*,
    594 U.S. 413 (2021)..........................................................................19

*Waggoner v. Barclays PLC*,
875 F.3d 79 (2d Cir. 2017) ................................................................. 11, 12

*Zakaria v. Gerber Prod. Co.*,
755 F. App'x 623 (9th Cir. 2018) ............................................................ 16

*Zakaria v. Gerber Prod. Co.*,
2017 WL 9512587 (C.D. Cal. Aug. 9, 2017) ........................................... 16

## **RULES**

Federal Rule of Appellate Procedure 5 ................................................... 22

Federal Rule of Appellate Procedure 32 ................................................. 22

Federal Rule of Civil Procedure 23 ........................................... 6, 7, 9, 10

## **INTRODUCTION**

Plaintiffs-Respondents Wilber Andrews and Stephen Kahn ("Plaintiffs") answer in opposition to Defendant-Petitioner Sazerac Company, Inc.'s ("Sazerac") petition for permission to appeal from the January 2, 2025 Order granting Plaintiffs' motion for class certification ("Order"), ECF No. 91.[1]

Rule 23(f) interlocutory review of a class certification decision should be limited to rare cases involving extraordinary circumstances. *In re Sumitomo Copper Litig.*, 262 F.3d 134, 140 (2d Cir. 2001). Sazerac argues, based on misstatements of the record and mere assertions, that the certification is a "death knell" because they will be forced to settle. But it provides no support to such a claim, and this Court has oft rejected such unsupported allegations.

Sazerac also claims—incorrectly—the Order is questionable because the expert report did not account for extraneous factors in calculating damages. But the argument is based on misinterpreting or ignoring the case law. Contrary to Sazerac's assertions, the Order is well-reasoned and falls squarely within precedent. As such, it is not "questionable."

Finally, Sazerac mischaracterizes its quibbles with the expert report to paint them as pressing legal issues. But it drastically overstates the split of authority,

---

[1] On January 23, 2025, the District Court withdrew the Order. (ECF No. 93.) Out of an abundance of caution, Plaintiff submits this opposition to the Petition.

presents a factual issue as a legal issue, and provides no support beyond mere assertions that these "questions" would escape later review.

In short, there is nothing in the Order that merits this Court's immediate intervention, and the Petition should be denied.

## **STATEMENT OF FACTS**

Sazerac, one of Forbes' "Top Private Companies" with $3 billion in revenue,[2] sells two types of Southern Comfort brand liquor; the famous whiskey version and a knockoff malt version with half the alcohol ("Product"). Sazerac recently produced the malt version to skirt New York's laws restricting where and when liquor can be sold. Sazerac refers to this as "convenience."

The two products are nearly identical, as each has the same:

- Color scheme, including the red lid;
- Ribbed bottle with a bulge in the neck;
- Size bottle;
- Name "Southern Comfort";
- "Est. 1874" tagline;
- "Original" tagline;
- "M.W. Heron" statement;
- Fleur de lis; and
- "New Orleans" statement.

ECF No. 71-1, at 3.

---

[2] Forbes, Top Private Companies (Nov. 25, 2024), available at https://www.forbes.com/lists/top-private-companies/

Reasonable consumers, including Plaintiffs and Class members, believe they are purchasing the distilled version when they are not. Plaintiffs' expert report shows that approximately 62.9% of surveyed consumers believed Southern Comfort Malt contained whiskey or distilled spirits, reinforcing claims of misleading packaging. *See* ECF No. 71-35, ¶ 32.

On March 15, 2024, Plaintiffs moved for Class Certification of a class of New York purchasers of the Product. ECF No. 71-1, p. 8. In support of this, Plaintiffs submitted a report by Dr. William Ingersoll, who conducted a conjoint analysis and determined that

> . . . the percentage of the value that a belief that the alcohol type used is Whisky (Distilled Spirit), when it was actually Malt, would result in 8.8% of the price being a price premium due to that belief. Without that belief, price[s] for the product would have been reduced by 8.8% of that price for all purchasers.

ECF No. 71-36, ¶ 91.

> Moreover,

> By relying on real world transaction data to set the prices, [his] price attribute is grounded in the equilibrium market price generated by the intersection of supply and demand. So, these are not speculative, what-if prices, but are instead prices that occurred in the real world, accounting for the supply side at the time.

*Id.* ¶ 43.

On January 2, 2025, the District Court granted class certification under Rule 23(b)(3), finding Plaintiffs satisfied Rule 23. *See* ECF No. 91. On January 17,

2025, Sazerac filed the present petition. On January 23, 2025, the District Court

withdrew the Order "pending issuance of its amended order…." ECF No. 93.

## LEGAL STANDARD

"[P]etitioners seeking leave to appeal pursuant to Rule 23(f) must

demonstrate either (1) that the certification order will effectively terminate the

litigation and there has been a substantial showing that the district court's decision

is questionable, or (2) that the certification order implicates a legal question about

which there is a compelling need for immediate resolution." *Sumitomo*, 262 F.3d

at 139.

"[A] novel legal question will not compel immediate review unless it is of

fundamental importance to the development of the law of class actions and it is

likely to escape effective review after entry of final judgment." *Id.* Whether

interlocutory review is warranted is "tempered by… [this Court's] longstanding

view that the district court is often in the best position to assess the propriety of the

class and has the ability, pursuant to Rule 23(c)(4)(B), to alter or modify the class,

create subclasses, and decertify the class whenever warranted." *Id.* at 139.

Moreover, "fail[ure] to demonstrate why [a] … legal question [] cannot be

fully reviewed on appeal from the final judgment [is] … a circumstance that, alone,

establishes an adequate basis to deny the petition." *Id.* at 142. Furthermore,

"issues that would result at most in a modification of a certification order or whose

ultimate resolution will depend on further factual development [are] unlikely candidates for Rule 23(f) appeal." *Id.* at 140 (internal citations omitted).

In light of the foregoing, "the standards of Rule 23(f) will rarely be met." *Id.* at 140. And Sazerac failed to demonstrate them here.

## <u>ARGUMENT</u>

### I. <u>There is No Evidence Certification will Terminate the Litigation, Nor that the Order is Questionable</u>

#### A. Sazerac Failed to Adduce Evidence that Certification will Terminate the Litigation

Sazerac argues, without evidence, that certification rings a death knell because it will now feel "[t]he 'inordinate or hydraulic pressure'" to settle. Petition at 9. But a "death-knell situation" arises only "when a grant of certification may 'force a defendant to settle rather than incur the costs of defending a class action and run the risk of potentially ruinous liability.'" *Chamberlan v. Ford Motor Co.*, 402 F.3d 952, 957 (9th Cir. 2005) (quoting *Blair v. Equifax Check Servs.*, 181 F.3d 832, 834 (7th Cir. 1999)).

Illustrative of the application of this principle, in *Chamberlan*, Ford Motor Company argued "that the class certification creates immense pressure to settle," because "it is being forced into the prospect of an 'all or nothing' class trial in which well over one hundred thousand class members will be collectively seeking an award approaching or exceeding one hundred million dollars in damages and attorneys' fees." *Chamberlan*, 402 F.3d at 960.

The *Chamberlan* court made clear that "[w]hen evaluating whether the certification would end the litigation for Ford, we consider whether Ford has sufficiently demonstrated 'that the damages claimed would force a company of its size to settle without relation to the merits of the class's claims.'" *Id.* (quoting *In re Loraepam*, 289 F.3d 98, 108 (D.C. Cir. 2002)). But the *Chamberlan* court rejected Ford's call, noting, "Ford has made no showing that it lacks the resources to defend this case to a conclusion and appeal if necessary or that doing so would 'run the risk of ruinous liability.'" *Chamberlan*, 402 F.3d at 960 (Fed.R.Civ.P. 23, Advisory Committee Notes to 1998 Amendments, Subdivision (f)). It also noted, "Ford's claims are conclusory and are not backed up by declarations, documents, or other evidence demonstrating potential liability or financial condition." *Chamberlan*, 402 F.3d at 960. The Court did "acknowledge that the potential recovery here may be 'unpleasant to a behemoth' company, but it is hardly terminal." *Id.* (internal citation omitted).

The *Chamberlan* analysis is on all fours with Sazerac's Petition. Sazerac claims—incorrectly—that "millions of bottles of malt-based Southern Comfort" were sold. Petition at 9. But Sazerac's claim is made without citation to any authority, nor could it, as it is simply incorrect. Per the record, Sazerac sold tens of thousands—not millions—of units in New York. *See* ECF No. 68 at 10.

6

And while Sazerac drastically overstates the Products' sales, and with it its potential liability, it also fails to provide any evidence—beyond mere assertions—that certification would place "substantial pressure" on it to settle. *See In re Rail Freight Fuel Surcharge Antitrust Litig.*, 725 F.3d 244, 251 (D.C. Cir. 2013) ("defendants invoking the death-knell rationale must go beyond 'mere assertions'"); *In re Lorazepam*, 289 F.3d at 108 ("Other than mere assertions, Mylan makes no showing that it will be unduly pressured to settle because of the class's certification. Mylan failed to submit any evidence that the damages claimed would force a company of its size to settle without relation to the merits of the class's claims"). On the contrary, Sazerac is on Forbes' list of the Top Private Companies, with $3 billion in revenue. Other than hyperbole, Sazerac provided no evidence that this case is "terminal."

Nor could the fact that the class is certified, in and of itself, represent inordinate pressure. If that were so, every certification would classify as a death knell for defendants, allowing the exception to swallow the rule. *See In re Visa Check/MasterMoney Antitrust Litig.*, 280 F.3d 124, 145 (2d Cir. 2001) ("The effect of certification on parties' leverage in settlement negotiations is a fact of life for class action litigants"); *see also Pryce v. Progressive Casualty Ins. Co.*, 2022 WL 2467013, at * (E.D.N.Y. Jun 10, 2022) ("Indeed, if Progressive's theory carried the day, requests to stay pending Rule 23(f) appeal would be granted as a matter of

course, since the certification of every class imposes at least some settlement pressure on defendants"); *Roseman v. Bloomberg*, 2017 WL 5176379, at *2 (S.D.N.Y. Nov. 7, 2017) ("Without a stronger showing, this argument would require the issuance of a stay in virtually every certification of a class action").

At base, Sazerac's death knell argument is predicated on incorrect numbers and conclusory assertions. It adduced no support for the conclusion that certification would apply an inordinate amount of pressure.

### B. The Certification Order is Well Reasoned and Does Not Present Grounds for Immediate Review

Sazerac's failure to adduce any evidence of actual pressure, other than citing incorrect sales figures and its own unsupported assertions, should end the inquiry. Notwithstanding, Sazerac's arguments for the "questionable" nature of the Order are equally faulty.

#### i. *Sazerac Misconstrues Comcast and Dr. Ingersoll's Report*

Sazerac first attempts to call into question the Order by claiming Dr. Ingersoll failed to account for the convenience of purchase in the conjoint analysis. Petition at 10. According to Sazerac, this violates *Comcast Corp. v. Berend*, 133 S.Ct. 1426 (2013).

But the argument relies on a drastic misinterpretation of *Comcast*. "In *Comcast*, the plaintiffs filed a class-action antitrust suit claiming that Comcast's acquisition of competitor cable television providers in sixteen counties clustered

around Philadelphia violated the Sherman Act." *Roach v. T.L. Cannon Corp.*, 778

F.3d 401, 405-06 (2d Cir. 2015) (citing *Comcast* 133 S.Ct. at 1430). "The plaintiffs

offered four theories of antitrust injury or impact, only one of which the district

court concluded was susceptible of classwide proof: Comcast's clustering around

Philadelphia reduced competition from 'overbuilders,' competitors who build

competing cable networks where there exists an incumbent cable provider." *Id.* at

406 (citing *Comcast*, 133 S.Ct. at 1430-31). "To prove that the damages resulting

from the anticompetitive injury were measurable on a classwide basis, the plaintiffs

offered expert testimony that modeled the class damages based on all four theories

of antitrust injury; the model did not isolate damages resulting from the

'overbuilder' theory." *Roach*, 778 F.3d at 406 (citing *Comcast*, 133 S.Ct. at 1431).

In reversing, the Supreme Court "explained that the plaintiffs would be entitled

only to damages resulting from their theory of injury." *Roach*, 778 F.3d at 407

(citing *Comcast*, 133 S.Ct. at 1433). "Thus, 'a model purporting to serve as

evidence of damages ... must measure only those damages attributable to that

theory.'" *Roach*, 778 F.3d at 407 (quoting *Comcast*, 133 S.Ct. at 1433). "'If the

model does not even attempt to do that,' the Court explained, 'it cannot possibly

establish that damages are susceptible of measurement across the entire class for

purposes of Rule 23(b)(3).'" *Roach*, 778 F.3d at 406 (quoting *Comcast*, 133 S.Ct.

at 1433).

9

Because there was "no question" that the damages model was not based solely upon the "overbuilder" theory of injury certified by the district court, but also included calculations accounting for the three other theories of injury, *id.* at 1433–34, the Court concluded that "Rule 23(b)(3) cannot authorize treating [cable] subscribers within the Philadelphia cluster as members of a single class," *id.* at 1435.

*Roach*, 778 F.3d at 407.

Sazerac's interpretation would flip *Comcast* on its head by requiring Dr. Ingersoll to measure something ***not*** part of Plaintiffs' theory of liability, namely, the price premium associated with convenience. The District Court recognized and rightfully rejected this, stating:

But Sazerac doesn't cite any cases that say a conjoint analysis must control for *external* factors like flavor and convenience to measure the existence of a price premium. In the cases cited by Sazerac, courts emphasize that conjoint analyses must accurately isolate the *product* features that are allegedly misleading.

Order at 11.

While the Second Circuit has not addressed this interpretation directly, the decisions in *Kurtz v. Costco Wholesale Corp*. and *Waggoner v. Barclays PLC* are instructive. In *Kurtz¸* a consumer brought a class action against two toilet wipe manufacturers for the allegedly deceptive "flushable" claim on the packaging. *Kurtz*, 818 F. App'x 57, 59 (2d Cir. 2020). The plaintiff's expert, Colin Weir, "'developed and performed hedonic regression analyses' indicating 'that there is a marketwide price premium for wipes labeled as flushable.'" *Id.* at 61 (citation

omitted). Like Sazerac, the *Kurtz* defendants challenged the analysis under

*Comcast*, but this Court rejected that:

> Defendants' reliance on *Comcast Corp. v. Behrend*, is similarly
> unavailing. *Comcast* held that "a model purporting to serve as evidence
> of damages in [a] class action must measure only those damages
> attributable to that theory." Weir's model does: it purports to measure
> the price premium attributable to the "flushable" label. The fact that
> Weir's model may fail to account for other possible sources of a price
> premium simply means that his model may not ultimately prove
> Plaintiff's claim. But it still serves as common evidence of plaintiffs'
> theory of injury and does not run afoul of *Comcast*.

*Kurtz*, 818 F. App'x at 62 (citations omitted).

Similarly, in *Waggoner*, several plaintiffs brought a securities fraud action

against a financial services provider. *Waggoner*, 875 F.3d 79 (2d Cir. 2017). In

upholding class certification, this Court rejected the defendants' argument:

> The Plaintiffs' damages model in this case complies with *Comcast*. The
> Plaintiffs' allegations are that shareholders of Barclays' ADS were
> harmed when statements that maintained the impression that Barclays
> was protecting its LX investors were shown to be false, thereby
> exposing Barclays' business practices and culture, and causing a
> substantial drop in share price. Their damages model directly measured
> that harm by examining the drop in price that occurred when the New
> York Attorney General's action revealed ongoing problems related to
> Barclays' management. This is not a case where a plaintiff's damages
> model does not track his theory of liability. Instead, this is a case in
> which the Plaintiffs' "proposed measure for damages is ... directly
> linked with their underlying theory of classwide liability ... and is
> therefore in accord with the Supreme Court's ... decision in *Comcast*."
>
> * * * * *
>
> Finally, we are not persuaded by the Defendants' argument that class
> certification was improper under *Comcast* because the Plaintiffs'

11

> damages model failed to account for variations in inflation over time. *Comcast* does not suggest that damage calculations must be so precise at this juncture. To the contrary, *Comcast* explicitly states that "[c]alculations need not be exact." Thus, even accepting the Defendants' premises that inflation would have varied during the class period in this case and that such variation could not be accounted for, the Defendants' argument fails.

*Waggoner*, 875 F.3d at 106 (citations omitted).

The *Kurtz* and *Waggoner* decisions illustrate that a damages model does not need to calculate every externality. To the contrary, it needs to focus on calculating the damages arising from the theory of liability only.

In its Petition, Sazerac failed to cite any new authority that would support its interpretation of *Comcast*, and the cases Sazerac cited below highlight the need to avoid calculating extraneous factors. As stated by the District Court:

> For example, in *Price v. L'Oréal USA*, the court rejected a conjoint analysis that combined "Keratindose" and "Pro-Keratin" with "+ Silk," because "the analysis d[id] not tell the Court whether the survey respondents would pay a price premium because the product is advertised as containing keratin, because it is advertised as containing silk[,] or a combination of the two." Similarly, in *Passman*, the court rejected a conjoint analysis that isolated the price premium attributable to the phrase "ever-growing library of classes." The plaintiffs' theory was that consumers specifically derived value from the phrase "ever-growing." The "model does not prove that theory," the court explained, "because it does not disentangle the library of classes that was Peloton's innovation from the fact that this library was 'ever-growing.'"

Order at 11 (citation omitted).

Sazerac criticizes Dr. Ingersoll's report for failing to do what caused the conjoint analyses in *Price* and *Passman* to be rejected, namely, including a feature

12

that was not part of the theory of liability. And while Sazerac would no doubt like for Plaintiffs to make such a mistake, Dr. Ingersoll conducted the analysis correctly.

Having thoroughly analyzed the arguments, cases, and Dr. Ingersoll's report, the District Court reached a well-reasoned and correct decision. There is nothing questionable in it, and Sazerac has no grounds for immediate appeal.

    ii.    *Dr. Ingersoll Properly Accounted for Supply-Side Factors by Using Actual Market Prices in Conducting the Survey*

Sazerac also questions Dr. Ingersoll's conclusions by falsely claiming that he did not account for supply-side factors. Petition at 15-20. While courts have recognized that conjoint analyses do measure "willingness to pay," the courts have also recognized that the inclusion of actual prices at which the products were sold in the market will account for supply-side factors. *See e.g Hadley v. Kellogg Sales Co.*, 324 F. Supp. 3d 1084, 1105 (N.D. Cal. 2018); *Hasemann v. Gerber Prod. Co.*, 2024 WL 1282368, at \*18 (E.D.N.Y. Mar. 25, 2024).

In *Hadley*, the seminal case on the issue, a consumer brought a class action against a cereal manufacturer for several misleading statements regarding the products. *Hadley*, 324 F. Supp. 3d at 1091. Kellogg argued, just as Sazerac does here, that the

> …proposed conjoint analysis measures "consumers' subjective willingness to pay for the challenged statement[s]"—or in other words, consumer demand—without considering the supply side of the equation. Consequently, according to Kellogg, the conjoint analysis cannot possibly "calculate the price premium charged by Kellogg for

13

the challenged statement[s]" because " 'the ultimate price of a product is a combination of market demand and market supply.' "

*Hadley*, 324 F. Supp. 3d at 1104 (citations omitted).

In rejecting this argument, Judge Koh—prior to being elevated to the Ninth Circuit—provided the following detailed analysis of why the inclusion of actual prices in a conjoint survey is sufficient to account for supply-side factors:

> Kellogg is correct that, in cases where price premia are the relevant measure of damages, courts have repeatedly rejected conjoint analyses that only measure demand-side willingness-to-pay. However, courts have also found that conjoint analyses can adequately account for supply-side factors—and can therefore be utilized to estimate price premia without running afoul of *Comcast*—when (1) the prices used in the surveys underlying the analyses reflect the actual market prices that prevailed during the class period; and (2) the quantities used (or assumed) in the statistical calculations reflect the actual quantities of products sold during the class period. For example, in *In re Dial Complete Marketing and Sales Practices Litigation*, 320 F.R.D. 326 (D.N.H. 2017), the court approved a proposed conjoint analysis where the plaintiffs argued that the conjoint analysis had adequately "account[ed] for the supply side" because "the supply element of the supply and demand price function is fixed" in the analysis "and is set, or included, *in the [market] price[s]* paid for" the product at issue. *Id.* at 334 (emphasis added). The court further noted that the proposed conjoint analysis was "one in which quantity (the number of products with the offending claims actually sold) *is held constant* ... in determining" the price premium, *id.* at 336 (emphasis added), which means that the conjoint analysis used a "quantity" figure that matched the quantity of the challenged product that was actually sold during the class period. The court explained that the reason the proposed conjoint analysis "held" quantity "constant" in this manner was because the conjoint analysis sought to calculate the price premium attributable to the challenged labeling statement by first "calculat[ing] the highest price in the actual market at which Dial could have sold *the same number* of products without the challenged [statement]." *Id.* (emphasis added); *see also In re MyFord Touch Consumer Litig.*, 291 F. Supp. 3d

14

936, 969–71 (N.D. Cal. 2018) ("*MyFord Touch II*") (approving a nearly identical proposed conjoint analysis from the same expert and finding that the conjoint analysis adequately accounted for supply-side factors "by assuming that the supply—the quantity—was fixed"); *Davidson v. Apple, Inc.*, 2018 WL 2325426, at *22 (N.D. Cal. May 8, 2018) (finding that a proposed conjoint analysis from the same expert adequately "account[ed] for the supply side of the equation" by holding supply (and therefore quantity) constant).

Similarly, in *Fitzhenry-Russell v. Dr. Pepper Snapple Group, Inc.*, 2018 WL 3126385 (N.D. Cal. June 26, 2018), the court rejected the defendant's argument that the plaintiffs' proposed conjoint analysis ignored supply-side factors and "only considered a consumer's *willingness to pay* in the conjoint survey." *Id.* at *8. The court concluded that, contrary to the defendant's position, the proposed conjoint analysis "calculated the price premium consumers paid for the [challenged] claim, and not just a theoretical willingness to pay," because, among other things, the conjoint survey (1) "used *actual market-clearing prices* as the basis for the prices in the survey"; and (2) "took into account the *fixed quantity of supply* of [the product] because *those sales occurred in the past.*" *Id.* at *8 (emphases added) (internal quotation marks omitted). Likewise, in *In re Lenovo Adware Litigation*, 2016 WL 6277245 (N.D. Cal. Oct. 27, 2016), the court found that a proposed conjoint analysis adequately "ensure[d] that the results [of the conjoint analysis] would 'reflect the market' "—and not just demand-side willingness-to-pay—by (1) incorporating the market " 'pric[es] of the [products] at issue [and of] comparable [products]' " into the survey; and (2) holding quantity constant "because all sales of the [products] at issue have occurred in the past." *Id.* at *21 (internal quotation marks omitted).

*Hadley*, 324 F. Supp. 3d at 1105-06.

The critical dichotomy between whether to include actual prices was displayed in *Hasemann.* In that case, consumers brought a class action against Gerber for misleading claims on its Good Start Gentle infant formula. *Hasemann*, 2024 WL 1282368, at *1. In *Hasemann*, Gerber argued—just like Sazerac does

here—that the conjoint did not reflect market conditions and therefore did not calculate the price premium. *Id.* at *18. In rejecting Gerber's argument, the *Hasemann* court provided the following analysis:

> Variations of this critique have led courts to reject conjoint analyses as evidence of damages. Most relevant here, the Ninth Circuit affirmed a grant of summary judgment for Gerber in another class action over the marketing of GSG because the plaintiffs' expert's conjoint analysis could not prove a price premium. *Zakaria v. Gerber Prod. Co.*, 755 F. App'x 623, 624–25 (9th Cir. 2018), *aff'ing Zakaria v. Gerber Prod. Co.*, No. 15–CV–200, 2017 WL 9512587 (C.D. Cal. Aug. 9, 2017). The *Zakaria* expert (who was not Dr. Boedeker) proffered a conjoint analysis that "did not reflect market realities and prices for infant formula products." *Id.* at 624. The conjoint survey asked subjects whether they would pay prices that did "not directly correlate to actual market prices" for Gerber infant formula. *Zakaria*, 2017 WL 9512587, at *10. Instead, it "showed only how much consumers subjectively valued the 1st and Only Seal, not what had occurred to the actual market price of Good Start Gentle with or without the label." 755 F. App'x at 625. Thus, "regardless [of] whether consumers were willing to pay a higher price for the labeled product, the expert's opinion did not contain any evidence that such higher price was actually paid." *Id.*

> Here, Dr. Boedeker's conjoint analysis provides an acceptable, though likely imperfect, estimate of a price premium. That is because Dr. Boedeker — unlike the *Zakaria* expert — "evaluate[d] empirical marketplace data to determine whether customers actually paid a premium." *Zakaria*, 2017 WL 9512587, at *10. In contrast to the methodology rejected in *Zakaria*, Dr. Boedeker "analyzed the actual revenues and quantities sold of [GSG] products in the states of New York and Florida during the class period." Boedeker Report ¶ 60. For example, Boedeker presented participants with prices ranging from $22.99 to $32.99 for 23.2-ounce canisters of powdered formula, *id.*, based on actual prices at which GSG canisters had been sold in Florida and New York over the course of the class period. *See id.* ¶ 57. That empirical data "tether[s]" Dr. Boedeker's opinion "to actual market conditions, including pricing and premiums." *Zakaria*, 2017 WL 9512587, at *20.

*Hasemann*, 2024 WL 1282368, at *18.

Per *Hasemann* and *Hadley*, conjoint analysis ***can*** account for supply-side factors if it uses the prices and quantities used in the market. That is precisely what Dr. Ingersoll did here.

> In designing his survey, Ingersoll used pricing data generated from "actual market transactions in New York," obtained from Circana, a consumer data company. Dkt. 71-36 ¶¶ 39-40, 43. "That empirical data 'tether[s]' [Ingersoll's] opinion 'to actual market conditions, including pricing and premiums.'"

Order at 12 (citation omitted).

The District Court agreed with the majority of cases and "found that relying on historical pricing data is sufficient to account for supply-side factors in a 'classic mislabeling' case." Order at 12-13 (citing *In re Gen. Motors*, 407 F. Supp. 3d, 212 238-39 (S.D.N.Y. 2019) (collecting cases); *see also Sharpe v. A&W Concentrate Co.*, 2021 WL 3721392, at *7-8 (E.D.N.Y. July 23, 2021) (explaining why historical data is particularly appropriate for mislabeling cases); *In re Folgers Coffee, Mktg. Litig.*, 2024 WL 4068851, at *6 n.12 (W.D. Mo. July 31, 2024) (declining to adopt *Passman*'s reasoning because the court "relied exclusively on the defendant's expert and did not address the many cases that have found historical sales and market data are sufficient")).

Having followed the well-trodden path of cases upholding conjoint surveys which include actual market prices, the Order is not "questionable," it is well

reasoned and well supported. *See also In re Worldcom, Inc.*, 2005 WL 1208527, at *1 (S.D.N.Y. May 20, 2005) ("As to the first prong, Judge Gonzalez's determination that the proposed classes lack commonality, typicality, and predominance, far from being questionable, is in line with the overwhelming majority of courts that have considered class certification in similar factual circumstances"). As such, Sazerac has no grounds for immediate appeal.

## II. Sazerac Fails to Identify an Unsettled Legal Question that Would Escape Later Review

Sazerac attempts to shoehorn the above arguments into the second *Sumitomo* prong by claiming—incorrectly—that the viability of Dr. Ingersoll's report represents a novel legal question. This argument fails for four reasons.

*First*, Sazerac drastically overstates the split of authority. While the District Court recognized that "some courts have rejected conjoint analyses as evidence of a price premium on the ground that they 'measure[] consumers' private valuations' of a product and not 'the *market value* of' the product itself," Sazerac points to scant case law where the courts have rejected conjoint analyses that ***included*** the actual sales prices of the products to account for the supply side of the equation. Even its own authority said that "[i]n a classic mislabeling case. . . that makes sense." *In re Gen. Motors*, 407 F. Supp. 212 at 239. Only the *Passman v. Peloton Interactive, Inc.*, 671 F. Supp. 3d 417, 439 (S.D.N.Y. 2023) rejected this approach. Sazerac glosses over this critical fact to paint a much greater split than actually exists.

*Second*, the legal "question" Sazerac poses is:

> . . . whether a class may be certified when the only measure of class-wide damages is a "price premium" analysis focused solely on consumers' willingness to pay, without regard for the supply side of the equation.

Petition at 21.

Even if, *arguendo*, the Court were to answer this question in Sazerac's favor, it would not address the viability of Dr. Ingersoll's report because it would not answer whether the actual market prices are sufficient for the supply side of the equation. This would render a decision merely advisory, "[a]nd federal courts do not issue advisory opinions." *TransUnion LLC v. Ramirez*, 594 U.S. 413, 424 (2021).

*Third*, there is no outstanding **legal** question to be resolved. The case law on damages is well-settled through *Comcast* and its progeny (e.g. *Roach* 778 F.3d 401). The District Court was merely applying that precedent to the facts of this case. *See In re LIBOR-Based Financial Instruments Antitrust Litig.*, 299 F. Supp. 3d 430, 609 (S.D.N.Y. 2018) (question was not a "novel legal question" "likely to escape effective review" where "none of our holdings depends strictly on our analysis of an unsettled area of law; rather, they represent our application of well-settled principles of class certification law to a unique set of facts").

Moreover, the question at issue is whether Dr. Ingersoll's report sufficiently measures the supply side of the equation. That is a question of credibility for the jury, not a question of law. *See In re Visa Check*, 280 F.3d at 135 ("The question for

19

the district court at the class certification stage is whether plaintiffs' expert evidence is sufficient to demonstrate common questions of fact warranting certification of the proposed class, not whether the evidence will ultimately be persuasive"); *see also Monell v. Scooter Store, Ltd.*, 895 F. Supp. 2d. 398, 412 (N.D.N.Y. 2012) ("the fact that Defendants have presented conflicting expert testimony that the Go–Go scooter was safe as designed creates questions of fact and credibility determinations to be answered by the jury").

*Finally*, even if, *arguendo*, the Court were to agree with Sazerac that this is a novel legal question—which it is not for the reasons just discussed—Sazerac still failed to explain why this would "escape effective review after entry of final judgment." Sazerac asserts that it will be subject to the "*in terrorem* effect" of certification, thereby compelling settlement. But as before, it presented no evidence to support this claim.

When the Court previously accepted this argument, it was "the largest corporate fraud and accounting scandal in United States history," noting "[t]his is not the run-of-the-mill class action, or even the run-of-the-mill securities class action." *Hevesi v. Citigroup Inc.*, 366 F.3d 70, 81 (2d Cir. 2004). The same cannot be said here. This is a "run-of-the-mill class action" and to allow Sazerac's argument to carry the day would render any class certification "likely to escape review."

## **<u>CONCLUSION</u>**

There is neither basis nor need for this Court to inject itself into the district court proceedings before final judgment. This Court should deny the Petition.

Date: January 27, 2025

Respectfully submitted,

*Neal Deckant*

Neal Deckant
**BURSOR & FISHER, P.A.**
1990 N. California Blvd
Walnut Creek, CA 94596
(925) 300-4455

**REESE LLP**
Michael R. Reese
*mreese@reesellp.com*
100 West 93rd Street, 16th Floor
New York, New York 10025
Telephone: (212) 643-0500

**SHEEHAN & ASSOCIATES**
Spencer Sheehan
60 Cuttermill Rd., #412.
Great Neck, NY 11021
(516) 268-7080

## <u>CERTIFICATE OF COMPLIANCE</u>

I hereby certify pursuant to Fed. R. App. Proc. 32(g) that the Opposition of Plaintiffs-Respondents Wilber Andrews and Stephen Kahn complies with Fed. R. App. Proc. 5(c) and (d), 32(a). The brief uses a proportionally spaced, serifs typeface (Times New Roman) of 14 points and contains 5,192 words (excluding, as permitted by Fed. Rule of App. Proc. 32(f), the cover page, table of contents, table of authorities, signature block, and certificate of compliance), as counted by the Microsoft Word processing system used to produce this brief.

Date: January 27, 2025    Respectfully submitted,

         **BURSOR & FISHER, P.A.**

         */s/ Neal J. Deckant*
         Neal J. Deckant
         1990 N. California Blvd., 9th Floor
         Walnut Creek, CA 94596
         (925) 300-4455